**NATIVE VILLAGE OF NOATAK; Circle Village, Plaintiffs–Appellants,**

**and**

**Native Village of Akiachak, Plaintiff,**

**v.**

**David HOFFMAN, as Commissioner, Department of Community and Regional Affairs, State of Alaska, Defendant–Appellee.**

**Nos. 87–4310, 87–4374.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1988.

Decided Feb. 12, 1990.

Lawrence A. Aschenbrenner and Robert T. Anderson, Anchorage, Alaska, for plaintiffs-appellants.

Gary I. Amendola and Douglas K. Mertz, Asst. Attys. Gen., Juneau, Alaska, for defendant-appellee Hoffman.

Before KOZINSKI, NOONAN and THOMPSON, Circuit Judges.

## ORDER

The opinion filed March 30, 1989 is hereby withdrawn. The panel has voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. General Order 5.4(b) now applies.

## OPINION

NOONAN, Circuit Judge:

The Native Village of Noatak, the Native Village of Akiachak and Circle Village brought this action against the Commissioner of the Department of Community and Regional Affairs of the State of Alaska (the Commissioner). The district court dismissed the case for want of jurisdiction. The Native Village of Noatak and Circle Village (the Native Villages) appeal to this court. We reverse and remand.

*The Parties*

Noatak is a government with a local governing board organized under the Indian Reorganization Act, 25 U.S.C. § 461 *et seq.* Circle Village has a traditional Council form of government. The defendant Commissioner is the principal officer of a department of the state of Alaska, responsible for administering the payment of revenue-sharing funds.

*The Causes of Action*

The Native Villages allege that they have been authorized to receive their pro rata share of the funds appropriated by the Alaska Legislature, up to $25,000, in accordance with Alaska Stat. §§ 29.89.010 and 29.89.050, which provided, "the state shall pay $25,000 to a Native Village government for a village which is not incor-porated as a city under this title." Alaska Stat. § 29.89.050 (1980). The plaintiffs allege that the Commissioner deliberately expanded the class of eligible recipients to include entities other than the Native Villages solely because of the racial ancestry of the individual members of the villages, in violation of the federal Constitution, of 42 U.S.C. § 1983 and of federal common law authorizing discrete treatment of Indian tribes, with the result that their share was diluted.

As a second cause of action the Native Villages assert that in so diluting the funds available, the Commissioner violated federal laws and policy intended to further tribal self-government, including the Indian Reorganization Act, 25 U.S.C. § 461 *et seq.;* the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–41; the Indian Financing Act of 1974, 25 U.S.C. §§ 1451 *et seq.;* the Indian Self–Determination and Education Assistance Act, 25 U.S.C. §§ 450 *et seq.;* the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601–1680; and the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 *et seq.*

As a third cause of action the Native Villages allege that the Commissioner's conduct also violated 25 U.S.C. § 476, which, they contend, grants native tribes the unrestricted right to contract with states. As a fourth cause of action the Native Villages claim that the Commissioner's conduct violated the First Amendment by destroying native culture and therefore their most basic form of expression, religion and association. Four additional claims are put forward as pendent state claims. The plaintiffs seek damages, an order directing the Commissioner to pay over the monies appropriated by the Legislature and an injunction prohibiting further administration of the statute in a way that would preclude the plaintiffs from receiving a full share.

*Proceedings*

The district court held that the court did not have jurisdiction because the plaintiffs' suit was barred by the eleventh amendment or because, in the alternative, t⁺

case did not arise under the Constitution, laws or treaties of the United States. This appeal followed.

*Analysis*

1. Jurisdiction

28 U.S.C. § 1362 provides that the district courts "shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." Are the Native Villages "tribes" which have been "duly recognized by the Secretary of the Interior?" The Native Villages represent bodies of Indians of the same race united in a community under a single government in a particular territory—Noatak at Bering Strait, Circle Village at Upper Yukon–Porcupine. They therefore meet the basic criteria to constitute Tribes. *Montoya v. United States,* 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901).

■ No statute expressly outlines how a tribe may become duly recognized for purposes of section 1362 jurisdiction. In *Price v. Hawaii,* 764 F.2d 623, 626 (9th Cir.1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771 (1986), this court left open the question whether formal organization or incorporation of a tribe followed by approval of the organization or incorporation by the Secretary of the Interior constituted being "duly recognized" for the purpose of the statute. We see no reason to suppose that the Secretary of the Interior needs to issue a special document conferring a right to sue under the statute. Noatak Village has a governing body approved by the Secretary. 25 U.S.C. § 476. It is therefore a tribe with a duly recognized governing body and qualifies for the benefits of section 1362. *Cf. Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1387 (9th Cir.1988) (uncertainty existed concerning structure of Alaska Indian villages involved; tribal status not resolved solely by reference to organization of tribe under Indian Reorganization Act).

■ Circle Village, like Noatak, is listed as a Native Village in the Alaska Native Claims Settlement Act, 43 U.S.C. § 1610(b)(1). The purpose of this Act was to make "a fair and just settlement of all claims by Natives and Native Groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). The Villages acknowledged by the Act were distinguished from ineligible villages "of a modern and urban character," where the majority of the residents were not natives. 43 U.S.C. § 1610(b)(2), (3). The Villages acknowledged by the Act were possessed of aboriginal land claims and became eligible for the benefits provided under the Act. The Act was congressional recognition of the Native Villages.

In addition, in three recently enacted statutes—the Indian Self–Determination Act, 25 U.S.C. § 450b(e); the Indian Financing Act, 25 U.S.C. § 1452(c); and the Indian Child Welfare Act, 25 U.S.C. § 1903(8)—Congress treated the Native Villages as Indian tribes. Arguably, Congress intended to confer recognition only for the particular purposes of each piece of legislation. *See, e.g., Native Village of Venetie,* 856 F.2d at 1387. But the nature and scope of the federal government's relationship with the Native Villages, as evidenced by these Acts, indicates that the recognition extends to legal claims. "[I]t is a settled principle of statutory construction that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, with doubtful expressions being resolved in favor of the Indians." *Three Affiliated Tribes v. Wold Eng'g, P.C.,* 467 U.S. 138, 149, 104 S.Ct. 2267, 2275, 81 L.Ed.2d 113 (1984).

It is true that section 1362 speaks of recognition by the Secretary of the Interior, not Congress, but the Secretary is only using power delegated by Congress. If Congress has recognized the tribe, a fortiori the tribe is entitled to recognition and is in fact recognized by the Secretary of the Interior. Consequently, Circle Village, as well as Noatak, qualifies under section 1362.

## 2. The Sovereign Immunity of the State of Alaska

The Commissioner contends that the Eleventh Amendment was properly applied by the district court to deny jurisdiction. What has been authoritatively resolved as to the jurisdiction of the federal courts of suits against the states is the following:

One state may not be sued by the citizens of another state. U.S. Const. amend. XI.

The citizens of a foreign state may not sue a state. *Id.*

The citizens of the same state may not sue the state. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

A corporation chartered by Congress may not sue a state. *Smith v. Reeves,* 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1900).

A foreign state may not sue the state. *Monaco v. Mississippi,* 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934).

The immunity of the states from suit in these cases has been addressed by the Supreme Court in terms of the Eleventh Amendment, interpreted well beyond its literal language, as *Hans, Smith,* and *Monaco* vividly illustrate. The Court, it may be felt, has constructed a jurisprudence in respect to this amendment in which the Court's own gloss, the Court's own readings of the amendment's spirit and purpose are what count. The same court that used the strongest language in stating the doctrine of sovereign immunity in *Hans* had no difficulty in subjecting the states to suit by the United States in *United States v. Texas,* 143 U.S. 621, 642, 12 S.Ct. 488, 492, 36 L.Ed. 285 (1892) (relying upon *United States v. North Carolina,* 136 U.S. 211, 10 S.Ct. 920, 34 L.Ed. 336 (1890), *overruled on other grounds, West Virginia v. United States,* 479 U.S. 305, 311 n. 4, 107 S.Ct. 702, 707 n. 4, 93 L.Ed.2d 639 (1987)). And in *South Dakota v. North Carolina,* 192 U.S. 286, 24 S.Ct. 269, 48 L.Ed. 448 (1904), the Court held that a state may sue another state in federal courts.

Chief Justice Hughes in *Monaco,* 292 U.S. at 329, 54 S.Ct. at 750, magisterially explained the reason for these differing results. In the cases where jurisdiction was found to exist, the states, by accepting the Constitution, consented to such jurisdiction as was "inherent in the constitutional plan." *Id.* The states have agreed to federal tribunals "essential to the peace of the Union." *Id.* at 328, 54 S.Ct. at 750.

Thus it is apparent that the literal language of the Eleventh Amendment does not control. Rather, the "principles of federalism" that inform the amendment, *Dellmuth v. Muth,* — U.S. ——, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989) are what have governed constitutional meaning here. The question consequently is, "Do the principles of federalism implicit in the Eleventh Amendment indicate that the states possess immunity from suit by an Indian tribe?"

Two opinions of the Supreme Court have suggested that there is immunity. In *United States v. Minnesota,* 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926), the plaintiff was the United States. The court assumed that the affected Indian tribe could not sue Minnesota because of what the Court termed "the general immunity" of the state from suit. *Id.* at 195, 46 S.Ct. at 301. The observation was the purest dictum. Again, in *Arizona v. California,* 460 U.S. 605, 614, 103 S.Ct. 1382, 1388, 75 L.Ed.2d 318 (1983), the Court stated that it was "[a]ssum[ed], *arguendo,*" that the intervention by the Indian tribes in the suit would violate the Eleventh Amendment, but held that, since the United States had already presented the claims of the tribes, "the States involved no longer may assert that immunity with respect to the subject matter." As the Court in neither case directly addressed the question, it remained unresolved.

■ In support of the Commissioner's position there stands the square holding of the Eighth Circuit, per Webster, J., in *Standing Rock Sioux Indian Tribe v. Dorgan,* 505 F.2d 1135 (8th Cir.1974). This case held, first, that, although the words of the amendment did not bar suit by an Indian tribe, the Eleventh Amendment should be "liberally construed to achieve its intended purpose," *id.* at 1138, and, so cor

strued, barred the suit; and, second, that 28 U.S.C. § 1362, creating federal jurisdiction of suits by Indian tribes, did not strip the states of their immunity. *Id.* at 1140.

As to the second proposition on the effect of 28 U.S.C. § 1362, there can now be little argument. It has been authoritatively held that to abrogate sovereign immunity of a state, Congress must express its intention to do so "in unmistakably clear language." *Welch v. Texas Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 478, 107 S.Ct. 2941, 2948, 97 L.Ed.2d 389 (1987). It has recently been reemphasized that congressional intent to abrogate sovereign immunity "must be both unequivocal and textual." *Dellmuth,* 109 S.Ct. at 2401. The statute conferring jurisdiction of suits brought by tribes does not unmistakably, unequivocally and textually abrogate the state's immunity, if immunity there is.

■ As to the first proposition that the Eleventh Amendment, liberally interpreted, has bestowed immunity, the question is more complicated. The proper interpretation of the Eleventh Amendment is not achieved by reading it as expansively as possible. A proper reading is a reading consistent with the principles of federalism that inform the amendment. These principles recognize that a consent by the states to suit may be "inherent in the constitutional plan" and that federal tribunals may be essential to the peace of the United States. It is in consideration of this truth that we respectfully part company with the conclusion of the Eighth Circuit in *Standing Rock.*

Article I, Section 8, Clause 3 of the Constitution provides Congress with power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." As to the tribes, this clause constitutes consent by the states to federal jurisdiction, for three reasons:

*First.* The tribes constituted a presence within the nascent United States. They were not foreign states that could be ignored or kept at arm's length. Every state in the new union was inhabited by tribes. 4 *Handbook of North American Indians*

7, 213 (W. Sturtevant ed. 1988). The new union could not exist without the allocation of governmental power in relation to them.

*Second.* Not only were they unlike any foreign nation in being in immediate proximity to the states, the tribes also stood in a relation that could break into armed hostility against the people of the United States. When the Constitution came into being, "[t]he first consideration" of the government as to Indian affairs was "peace." F. Prucha, *American Indian Policy in the Formative Years* 44 (1962). "The country, precariously perched among the sovereign nations of the world, could not stand the expense and strain of a long drawn-out Indian war." *Id.* On August 22, 1789, for example, President Washington and Secretary of War Knox met with the Senate and set before it the necessity "[t]o conciliate the powerful tribes of Indians in the southern District, amounting probably to fourteen thousand fighting Men.... The fate of the southern states ... may principally depend on the present measures of the Union towards the southern Indians." 2 *Senate Executive Journal and Related Documents* 31 (L. De Pauw ed. 1974).

The power of Congress to make war or peace and the power of the United States to make treaties was exercised in order to secure the states. In practice contemporaneous with the generation that adopted the Eleventh Amendment, the United States made treaties with "the Creek Nation," 7 Stat. 56 (1797), "the Cherokee Nation," 7 Stat. 62 (1798), and "the Chactaw Nation," 7 Stat. 66 (1802). Treaties with the Creeks in 1790, 7 Stat. 35, 37, and with the Cherokees in 1792, 7 Stat. 39, 40, treated the Indian country involved as a country which citizens of the United States could enter only if issued a passport by the United States. The United States entered into a mutual assistance pact with the Wyandots and other tribes by Article II of which the tribes agreed "to give their aid to the United States in prosecuting the war against Great Britain." 7 Stat. 118 (1814). The war power and the treaty power of the federal government have been decisively

interpreted as both expanding and confirming the jurisdiction surrendered to the United States by the Indian commerce clause. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832), *modified on other grounds, Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); *see* Newton, *Federal Power Over Indians: Its Sources, Scope, and Limitations,* 132 U.Pa.L.Rev. 195, 202 (1984).

*Third.* The power granted to the federal government over Indian affairs displaced the powers regularly exercised by the states within their borders. For example, the states have been unable to exercise criminal jurisdiction within Indian territory. *Worcester,* 31 U.S. (6 Pet.) 515. "With the adoption of the Constitution, Indian relations became the exclusive province of federal law." *Oneida v. Oneida Indian Nation,* 470 U.S. 226, 234, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).

To put the matter in another way, Indian tribes are more like the United States and the individual states of the United States than they are like individual citizens or like foreign states. Indian tribes have been explicitly held not to be foreign states. *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 18, 8 L.Ed. 25 (1831). Indian tribes are not like individual citizens because of their possession of many of the attributes of sovereignty. The view taken of Indian sovereignty by Chief Justice Marshall was reaffirmed by a unanimous Court holding "[t]he Creek or Muskogee Nation or tribe of Indians" free from liability for failure to keep the peace. *Turner v. United States,* 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919). The tribe, Justice Brandeis wrote for the Court, "exercised within a defined territory the powers of a sovereign people." *Id.* at 355, 39 S.Ct. at 109. It had been recognized by the United States as "a distinct political community." *Id.* at 357, 39 S.Ct. at 110. To invoke even more recent authority it has been held that the Indian Civil Rights Act does not authorize suit against a tribe because the Act does not explicitly override the tribe's sovereignty, and tribes must be acknowledged as "separate sovereigns pre-existing the Con-

stitution." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978).

Indian tribes, although not states, are like states in their presence within the United States as units of government, to be dealt with peacefully. Their presence as governmental units was as much a reality as the presence of the sister states at the time the Union was formed. Even more importantly, the Indian tribes are like the United States because it has been for their benefit that the United States has frequently sued the states. It is in a modern evolution of this relation between them and the United States that they now act for themselves.

Until 1966 the subjection of the states to the United States in Indian affairs was carried out by a statutory scheme which permitted the United States to vindicate the rights of a tribe. Speaking specifically of the relation of the United States to the Cherokees but using language applicable to the relationship between the United States and any Indian tribe, Justice Hughes wrote that as long as the United States is the guardian of the Indians, "the right and duty of the Nation to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid." *Heckman v. United States,* 224 U.S. 413, 437, 32 S.Ct. 424, 431, 56 L.Ed. 820 (1912). Addressing the position of the United States as the guardian of non-competent Osage Indians, Chief Justice White upheld the right of the United States to sue "to prevent the systematic violation of the state law committed for the purpose of destroying the rights created by the act of Congress." *United States v. Board of County Comm'rs,* 251 U.S. 128, 133, 40 S.Ct. 100, 101, 64 L.Ed. 184 (1919).

The general proposition is drawn from these cases "that the United States, by virtue of its special relationship with the Indians, has standing to effectuate federal policies by protecting and enforcing Indian rights arising out of that relationship." F. Cohen, *Handbook of Federal Indian Law* 308 (1982). The federal oversight of Indian affairs is an "exclusive and compelling in-

terest." *See Housing Auth. v. Washington*, 629 F.2d 1307, 1313 (9th Cir.1980) (per Anderson, J.). Since 1966, modern recognition of the ability of a tribe to act for itself has resulted in the enactment of 28 U.S.C. § 1362. In this new form the United States has exercised the authority ceded to it by the states in Article I, Section 8, Clause 3.

That the jurisdiction conceded by the states to the United States was originally exercised by the Congress and the Executive rather than by the federal courts is no refutation of the concession made by the states. In the course of time the United States did exercise its jurisdiction through the federal courts as it acted as the guardian of Indian rights. The modern view is that to the maximum extent possible the trust relation should recognize the autonomy of the tribes. *See The Supreme Court, 1984 Term—Leading Cases*, 99 Harv.L. Rev. 120, 262 n. 70 (1985). That view began to predominate in the 1960s. 2 F. Prucha, *The Great Father: The United States Government and the American Indians* 1088 (1984) [hereinafter F. Prucha, *The Great Father*]. As Robert L. Bennett, the Oneida Indian who became Commissioner of Indian Affairs, put it in a report dated July 11, 1966, "Paternalism creates attitudes of dependency which restrains the social and economic advancement of Indian people.... Indian leadership must be brought aboard to the fullest extent possible." Report from Robert L. Bennett to Henry M. Jackson (July 11, 1966), *quoted in* Prucha, *The Great Father*, at 1097. The statute enacted in 1966 is fairly read as the embodiment of the new policy, giving the tribes a right to sue that formerly only the United States exercised.

Section 1362 permits Indian tribes access to federal courts for cases in which the United State Attorney has declined to bring an action. It enables Indian tribes "to seek redress using their own resources and attorneys," S.Rep. No. 1507, 89th Cong., 2d Sess. 2 (1966), and "provides the means whereby the tribes are assured of the same judicial determination whether the action is brought in their behalf by the Government or by their own attorneys." H.R.Rep. No.

2040, 89th Cong., 2d Sess. 3, *reprinted in* 1966 U.S.Code Cong. & Admin. News 3145, 3147.

It may be asked whether a statute explicitly eliminating immunity is needed to authorize the tribes to sue the states. See *Welch*, 483 U.S. at 478, 107 S.Ct. at 2948. The question assumes that the states possess an immunity that Congress must override. But as *United States v. Texas*, 143 U.S. 621, 12 S.Ct. 488, and *South Dakota v. North Carolina*, 192 U.S. 286, 24 S.Ct. 269, show, if the consent of the states was inherent in the plan of the Constitution, no statute is necessary. The consent has already been given, and immunity to be overcome by Congress does not exist. If the suit of the tribes against Alaska depended solely on abrogation of the state's sovereign immunity, the tribe would encounter the teaching that congressional abrogation of state immunity must be by an explicit statute. *Dellmuth*, 109 S.Ct. at 2400. But the reason for that requirement is that abrogation of state sovereignty upsets the fundamental balance between the states and the United States. *Id.* Here the balance was struck in 1789.

It may also be asked if the above line of reasoning is not a restatement of the reasoning of Chief Justice Marshall that every surrender of a portion of sovereignty by a state carried with it an admission of liability to suit in the area of sovereignty surrendered. *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 380, 5 L.Ed. 257 (1821). Such a broad construction of concessions made by the states was repudiated in *Welch*, 483 U.S. at 482 n. 11, 107 S.Ct. at 2950 n. 11. The answer is that Indian affairs are sui generis and that in this unique area concerning relations with non-foreign governmental units, the surrender of state sovereignty carried with it a surrender of immunity from suit.

To recapitulate, there is no need for an explicit overriding of state immunity if the state in consenting to the Constitution has consented to being sued. The states did give consent to federal jurisdiction of Indian affairs. The Eleventh Amendment has not revoked the consent of the states, be-

cause neither in terms nor purpose does the amendment apply to Indian tribes. No other general immunity protects the state from suit by the tribes.

Finally, the question may be raised whether the plaintiffs in this case—Alaskan Indian villages—are entitled to the same treatment as the Indian tribes who were present on this continent when the Constitution was adopted. The leading case is *Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918). In that case the United States had acted to protect the fishing rights of the Metlakahtla, a band of about 800 Indians born in British Columbia who migrated to the Annette Islands, a small clump of isles in southeastern Alaska, and there founded a village. In upholding the protective action of the United States, the Court assimilated these foreign-born Alaska Indians to the Indians of the mainland by citing *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912) and its teaching that laws intended for the Choctaws and Chickasaws were to be liberally interpreted in their favor. Insofar as the present case is concerned, no distinction exists between Alaska Indians and those of the other states.

We conclude the plaintiffs are not barred by immunity of the state of Alaska.

### 3. *The Federal Causes of Action*

■ The state maintains that the plaintiffs have not alleged federal causes of action. Obviously there was no duty on the part of Alaska to vote a bonus of $25,000 to each Native Village. Once having voted the bonus, however, the state could not take it away or dilute it on grounds violative of the fourteenth amendment. *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The plaintiffs allege that such a racially based dilution is what has occurred.

■ The state's answer is, "How can this be? We were giving a bonus to Native Villages whose membership was formed on a racial basis. We got away from the racial basis by making a nonracial criterion

the ground for the distribution." The plaintiffs' answer is that the original scheme of the bonus was based on their identity as political entities. To wipe out their political status on the ground that that status had an ethnic origin is itself a violation of the constitutional command not to discriminate on the basis of race. Paradoxical as it is, the allegation that the move from a tribal basis to a non-tribal basis for the bonus was racially discriminatory is an intelligible claim. Any governmental action based on the racial character of those affected is presumptively invalid. *Washington v. Seattle School Dist. No. 1,* 458 U.S. 457, 485, 102 S.Ct. 3187, 3202, 73 L.Ed.2d 896 (1982) (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979)). Alleging that such discrimination has happened here, the Native Villages have presented a claim which is neither plainly meritless under the Constitution nor foreclosed by prior cases. *Cf. Hagans v. Lavine,* 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974). Whether these allegations state a claim upon which relief can be granted is beside the point at this stage of the case. *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). The scope of our present inquiry is limited to a determination of whether the district court had jurisdiction. We hold that it did.

■ The Native Villages also properly invoked federal subject matter jurisdiction by their allegation that the Commissioner violated federal laws and policies intended to further tribal self-government. If, as they contend, the Commissioner acted because he believed that the Native Villages could not receive special benefits from the state, the Commissioner did act in an area where the action may be found to have been preempted by federal law. *White Mt. Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Similar conclusions follow as to the third and fourth causes of action where again it may be found that the action of the Commissioner was such as to deny the political reality of the Native Villages because of the Commissioner's view of their racial composition.

The pendent claims are cognizable if the four federal claims confer jurisdiction. Accordingly, the decision of the district court is REVERSED and the case REMANDED for further proceedings.

KOZINSKI, Circuit Judge, dissenting:

I am unable to join my colleagues in exploring the boundaries of the eleventh amendment because I do not agree that the district court had subject matter jurisdiction. Subject matter jurisdiction and sovereign immunity are both threshold inquiries, but the former presents a far easier question and I would therefore dispose of the case on those grounds. While I don't necessarily disagree with the majority's analysis of the eleventh amendment, I cannot help being concerned that it unnecessarily decides not one, but two difficult constitutional questions not properly before the court: whether Indian tribes are exempt from the eleventh amendment's restrictions on suits against states in federal court and, if so, whether the Native villages are Indian tribes for purposes of that amendment.[1] In so doing, the majority opinion creates a conflict with one of our sister circuits, *see Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135, 1140–41 (8th Cir.1974) (eleventh amendment applies to Indian tribes), and may in fact be contrary to two holdings of the Supreme Court, *see Arizona v. California*, 460 U.S. 605, 614, 103 S.Ct. 1382, 1388, 75 L.Ed.2d 318 (1983) (assuming that the eleventh amendment applies to Indian tribes); *United States v. Minnesota*, 270 U.S. 181, 195, 46 S.Ct. 298, 301, 70 L.Ed. 539 (1926) (same). In light of these real and potential conflicts, I would await a case where our jurisdiction is more secure before expounding on these difficult issues of eleventh amendment jurisprudence. I must therefore respectfully dissent.

To state a federal claim, it is not enough to invoke a constitutional provision or to come up with a catalogue of federal statutes allegedly implicated. Rather, as the Supreme Court has repeatedly admonished, it is necessary to state a claim that is substantial: "[T]he federal courts are without power to entertain claims otherwise within their jurisdiction if they are 'so attenuated and unsubstantial as to be absolutely devoid of merit,' 'wholly insubstantial,' 'obviously frivolous,' 'plainly unsubstantial,' or 'no longer open to discussion.'" *Hagans v. Lavine*, 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974) (citations omitted). We do not have jurisdiction over a claim, no matter how federal it purports to be, that is " 'patently without merit, or so insubstantial, improbable, or foreclosed by Supreme Court precedent as not to involve a federal controversy.'" *City of Las Vegas v. Clark County*, 755 F.2d 697, 701 (9th Cir.1985) (quoting *Demarest v. United States*, 718 F.2d 964, 966 (9th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984)).

While this doctrine has been criticized, *see, e.g., Hagans*, 415 U.S. at 538, 94 S.Ct. at 1379; *Rosado v. Wyman*, 397 U.S. 397, 404, 90 S.Ct. 1207, 1213, 25 L.Ed.2d 442 (1970); *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), it serves an important practical purpose: It prevents plaintiffs from using a federal court's pendent jurisdiction to propel state claims into federal court by attaching them to meritless federal claims. *See Hagans*, 415 U.S. at 555, 94 S.Ct. at 1388 (Rehnquist, J., dissenting); *Siler v. Louisville & Nashville R.R.*, 213 U.S. 175, 191–92, 29 S.Ct. 451, 454–55, 53 L.Ed. 753 (1909). And that is precisely what's happening here.

In 1980, the Alaska Legislature enacted a revenue sharing program according to

---

**1.** The majority devotes substantial attention to whether the Native villages are "Indian tribe[s] or band[s] with a governing body duly recognized by the Secretary of the Interior" for purposes of obtaining jurisdiction under 28 U.S.C. § 1362. Majority op. at 1160. This may be a fundamentally different question than whether the Native villages are tribes under the eleventh amendment. If, as the majority suggests, the eleventh amendment doesn't apply to Indian tribes because "Indian tribes are more like the United States and the individual states of the United States than they are like individual citizens or like foreign states," *id.* at 1163, shouldn't the majority determine whether the Native villages fit this description? Or, is any organized group of Indians exempt from the eleventh amendment's restrictions?

which all unincorporated communities with a Native village government would receive $25,000 a year. The following year, the state Attorney General advised the Department of Community and Regional Affairs, the state agency responsible for implementing the program, that the program violated the equal protection and public purpose clauses of the Alaska Constitution, art. I, § 1 and art. IX, § 6. In order to comply with the state constitution, the Department made the funds available to all unincorporated communities, whether or not they had Native village governments. The appellants, whose share of the pie may have been diminished when the class of recipients was broadened, disagreed with the Attorney General's analysis and filed this suit.

The villages' purported federal claim is that the state, once having decided to favor Indians over other citizens, is now precluded from treating them the same. As a matter of federal equal protection, this claim is frivolous: I am aware of no constitutional provision that requires a state to treat Indians and non-Indians differently. While the equal protection clause may *permit* states to favor Indians, it certainly does not compel it. The villages' equal protection claim is not aided in any way by the fact that the state Attorney General's equality requirement is based on the Alaska Constitution; the federal equal protection clause does not preclude the states from adopting constitutional provisions that guarantee equal treatment for their citizens.

Equally frivolous are the villages' claims based on various federal statutes intended to further tribal self-government. The Indian Reorganization Act, 25 U.S.C. §§ 461–79 (1982 & Supp. IV 1986), comprises a hodgepodge of statutes relating to land transfer and tribal organization. The Indian Civil Rights Act of 1968, Pub.L. 90–284, 82 Stat. 77–80 (codified as amended in scattered sections of title 25), extends a number of federal constitutional rights to members of Indian tribes and authorizes state courts to assume jurisdiction over certain causes of action arising on Indian reservations. The Indian Financing Act of 1974,

Pub.L. 93–262, 88 Stat. 77 (codified as amended in scattered sections of title 25), provides credit to members of Indian tribes. The Indian Self–Determination and Education Assistance Act, Pub.L. 93–683, 88 Stat. 2203 (codified as amended in scattered sections of titles 5, 25, 42 & 50), provides federal assistance for, among other things, tribal governments and school districts educating tribe members. The Indian Health Care Improvement Act, Pub.L. 94–437, 90 Stat. 1400 (codified as amended in scattered sections of title 25), as its name implies, relates to health care. The Indian Child Welfare Act of 1978, Pub.L. 95–908, 92 Stat. 3069 (codified as amended in scattered sections of title 25), includes provisions covering child custody proceedings and federal assistance for various family-related programs. Many of these statutes provide money to Indian tribes, but that is the full extent of their relevance to this lawsuit. By no stretch of the imagination do they preempt state constitutional provisions calling for equal treatment of Indians and non-Indians.

The villages' third and fourth federal causes of action are similarly insubstantial. Section 476 of title 25 permits Indian tribes to organize, adopt a constitution, and negotiate with the federal, state and local governments. It is difficult to ascertain exactly how this statute could be violated by diluting the villages' share of state revenues. The villages' contention that the dilution extinguished their powers of self-government and destroyed their Native culture, in violation of the first amendment, is hyperbole.

It is a "fundamental and long-standing principle of judicial restraint ... that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988); *see also Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501–02, 105 S.Ct. 2794, 2800–01, 86 L.Ed.2d 394 (1985); *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.,* 467 U.S. 138, 157–58, 104 S.Ct. 2267, 2278–79, 81 L.Ed.2d

113 (1984). Although the majority undoubtedly sees it differently, it clearly violates this principle by deciding two difficult questions of eleventh amendment jurisprudence not properly before this court. Even under the most generous construction of the federal Constitution and title 25 of the United States Code, the four federal claims fit any of the *Hagans* formulations of insubstantiality: They are "obviously frivolous;" they are "plainly unsubstantial;" they are "absolutely devoid of merit." They serve a single purpose: to transport state claims into federal court. I would accordingly affirm the district court's dismissal for lack of a substantial federal question and save these difficult eleventh amendment issues for another day. Judging from the state's relationship with the villages, that day may be coming soon enough.