**In the Matter of the Ownership of the Beds and Banks and all Waters of all Navigable Water Courses Within the 1873 Coeur D'Alene Reservation Boundary.**

**COEUR D'ALENE TRIBE OF IDAHO, in its own right and as the beneficially interested party subject to the trusteeship of the United States of America; Ernest L. Stensgar, Lawrence Aripa, Margaret Jose, Domnick Curley, Al Garrick, Norma Peone and Henry Sijohn, individually, in their official capacity and on behalf of all enrolled members of the Coeur D'Alene Tribe of Idaho, Plaintiffs,**

v.

**STATE OF IDAHO; Cecil D. Andrus, Governor; Pete Cenarrusa, Secretary of State; Larry Echohawk, Attorney General; J.D. Williams, Auditor; Jerry Evans, Superintendent of Public Instruction; Keith Higginson, Director, Dept. of Water Resources; each individually and in his official capacity; Idaho State Board of Land Commissioners; and Idaho State Department of Water Resources, Defendants.**

Civ. No. 91–0437–N–HLR.

United States District Court,
D. Idaho.

July 20, 1992.

Raymond C. Givens, Givens & Funke, Coeur d'Alene, Idaho, for plaintiffs.

Larry J. Echohawk, Atty. Gen., State of Idaho, Clive Strong, Steven W. Strack, Deputy Attys. Gen., Natural Resource Division, Boise, Idaho, for defendants.

## ORDER GRANTING MOTION TO DISMISS

RYAN, District Judge.

### I. FACTS AND PROCEDURE

This action was filed on October 15, 1991. The Complaint by the Coeur d'Alene Indian Tribe of Idaho and various individual tribe members (hereinafter collectively referred to as the "Tribe") against the State of Idaho and various state officials and agencies, seeks an order from the court quieting title in the Tribe to the beds, banks, and waters of all navigable watercourses within the 1873 boundaries of the Coeur d'Alene Reservation. These watercourses include Lake Coeur d'Alene. The Complaint further seeks a declaratory judgment that these beds, banks, and waters at issue are for the exclusive use, occupancy, and enjoyment of the Tribe. The Complaint also asks the court to declare invalid all Idaho statutes and ordinances which regulate or affect in any way the disputed lands and waters, and to declare invalid the water right set forth in Idaho Code § 67–4304 [1].

And, lastly, the Complaint seeks an injunction enjoining the State and its agencies and officials from taking any action to regulate or in any way affect the Tribe's right to these lands and waters.

Rather than answer the Complaint, the State, and the officials and agencies of the State, filed a Motion to Dismiss on November 13, 1991, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. The motion is brought on the grounds that this action is barred by the jurisdictional limitations imposed on the federal judiciary by the Eleventh Amendment to the United States Constitution. The motion is also made on the grounds that the Complaint fails to state a claim upon which relief may be granted.

The Tribe responded to the Motion to Dismiss on February 21, 1992. The State then filed its reply brief on March 6, 1992. A hearing on this motion was held on Wednesday, June 17, 1992, in Coeur d'Alene, Idaho. This motion is now ripe for decision.

### II. ANALYSIS

#### A. *Introduction*

The Tribe seeks to have all beds, banks, and waters of all navigable waters within the 1873 borders of the reservation returned to their exclusive occupancy and use. The court is acutely aware of the significant interests at stake for the parties on both sides of this dispute. Consequently, the court has conducted a very careful and thorough analysis of the memoranda filed by the parties and the cases cited therein, and the affidavits, and exhibits submitted in connection with the memoranda, as well as the arguments made by counsel at the hearing. Upon completion of this analysis, the court finds that the State's position is correct. The claims

---

**1.** Idaho Code § 67–4304 (1989) reads, in part, as follows:

The governor is hereby authorized and directed to appropriate in trust for the people of the state of Idaho all the unappropriated water of Priest, Pend d'Oreille and Coeur d'Alene Lakes or so much thereof as may be necessary to preserve said lakes in their present condition. The preservation of said water in said lakes for scenic beauty, health, recreation, transportation and commercial purposes necessary and desirable for all the inhabitants of the state is hereby declared to be a beneficial use of such water.

brought by the Tribe are barred by the Eleventh Amendment, and the Tribe has failed to state a claim upon which relief may be granted. Based on the discussion to follow, the Motion to Dismiss will be granted.

### B. *Motion to Dismiss as Relates to the State of Idaho*

■ The court has reviewed many cases dealing with state immunity under the Eleventh Amendment with respect to suits in federal court by Indian tribes against states. In terms of the motion now at issue, the court finds the recent Supreme Court case of *Blatchford v. Native Village of Noatak,* ── U.S. ──, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991), to be particularly instructive. In this case, the Supreme Court reversed the Ninth Circuit's decision in *Native Village of Noatak v. Hoffman,* 896 F.2d 1157 (9th Cir.1990).

In *Hoffman,* native village governments, which the Ninth Circuit accepted as falling within the definition of "tribes," sued the State of Alaska, the Alaska Department of Community and Regional Affairs, and the Commissioner of that department. The plaintiffs sought an order directing the state to pay over their pro rata share of revenue sharing monies appropriated by the state legislature. The plaintiffs further sought an injunction prohibiting the Commissioner from diluting the plaintiffs' share of those monies by expanding the class of eligible recipients. The plaintiffs further alleged that the actions of the state, its agencies and officials, violated the constitutional rights of the members of the tribes and villages, in violation of 42 U.S.C. § 1983.

The district court dismissed the case, holding that it lacked subject matter jurisdiction because the plaintiffs' suit was barred by the Eleventh Amendment or be- cause, in the alternative, the case did not arise under the Constitution, laws, or treaties of the United States. *Native Village of Noatak v. Hoffman,* 896 F.2d at 1159– 60. The plaintiffs then appealed to the Ninth Circuit.

The Ninth Circuit held that Eleventh Amendment immunity does not apply when a state is sued by an Indian tribe. *Id.* at 1165. The Ninth Circuit also held that although 28 U.S.C. § 1362 [2] did not expressly abrogate state immunity from suit by Indian tribes, an express abrogation was unnecessary because of its decision that the Eleventh Amendment does not apply when states are sued by tribes. *Id.* at 1164–65.

In *Blatchford,* the Supreme Court reversed the Ninth Circuit. The Supreme Court held that the Eleventh Amendment [3] bars suits by Indian tribes against states without their consent.

> Despite the narrowness of its terms, since *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact; that the judicial authority in Article III is limited by this sovereignty ... and that a State will therefore not be subject to suit in federal court unless it has consented to suit, either expressly or in the "plan of the convention."

*Blatchford v. Native Village of Noatak,* 111 S.Ct. at 2581 (citations omitted).

The tribes in *Blatchford* first argued that sovereign immunity only restricts suits by *individuals* against sovereigns, not by *sovereigns* (i.e. Indian tribes) against sovereigns. The Supreme Court

---

**2.** Title 28 U.S.C. § 1362 provides that, "[t]he district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C.S. § 1362 (Law. Co-op.1988).

**3.** The Eleventh Amendment reads as follows: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S.C.S. Constitution, Amendment 11 (Law. Co-op.1984).

noted that this same argument was rejected in *Principality of Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934).[4]

The tribes next argued that the states had waived their immunity from suits by Indian tribes when the states adopted the Constitution. This position was adopted by the Ninth Circuit, and led to the appeal to the Supreme Court. The Supreme Court held that:

> Just as in *Monaco* with regard to foreign sovereigns ... there is no compelling evidence that the Founders thought such a surrender inherent in the constitutional compact. We have hitherto found a surrender of immunity against particular litigants in only two contexts: suits by sister States ... and suits by the United States.

*Blatchford v. Native Village of Noatak*, 111 S.Ct. at 2582 (citations and footnote omitted). In making their argument, the tribes asserted that Indian tribes are more like states than foreign sovereigns, and they should therefore be allowed to sue states just as one state may sue another in federal court. The Supreme Court also rejected this assertion.

> The relevant difference between States and foreign sovereigns, however, is not domesticity, but the role of each in the convention within which the surrender of immunity was for the former, but not for the latter, implicit. What makes the States' surrender of immunity from suit by sister States plausible is the mutuality of that concession. There is no such mutuality with either foreign sovereigns or Indian tribes. We have repeatedly held that Indian tribes enjoy immunity from suits by States ... as it would be absurd to suggest that the tribes surrendered immunity in a convention to which they were not even parties. But if the convention could not surrender *the tribes'* immunity for the benefit of the *States*, we do not believe that it surren-

dered the States' immunity for the benefit of the tribes.

*Id.* at 2582–83 (citation omitted).

In addition, the Supreme Court held that 28 U.S.C. § 1362 does not abrogate the states' Eleventh Amendment Immunity from suit by Indian tribes. The Court noted the test for congressional abrogation set forth in *Dellmuth v. Muth*, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). The test requires that the intent of Congress to abrogate Eleventh Amendment immunity must be "unmistakenly clear in the language of the statute." *Id.* at 228, 109 S.Ct. at 2400. The Court ruled that 28 U.S.C. § 1362 did not meet this standard. *Blatchford v. Native Village of Noatak*, 111 S.Ct. at 2586.

The recent *Blatchford* decision clearly enunciates the Supreme Court's fundamental views about a state's Eleventh Amendment immunity from suit by Indian tribes. The Court expressly held that suits by tribes against states are barred by the Eleventh Amendment. The Court also expressly held that suits against states for money damages are barred. In addition, the Supreme Court in a previous decision made it clear that the Eleventh Amendment bars suits against states in *both law and equity*. "And, as when the *State itself* is named as the defendant, a suit against state officials that is in fact a suit against a State is barred *regardless of whether it seeks damages or injunctive relief.*" *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101–02, 104 S.Ct. 900, 908–09, 79 L.Ed.2d 67 (1984) (citation omitted). The Court made this quite clear in *Cory v. White*, 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982):

> *Edelman* did not hold, however, that the Eleventh Amendment never applies unless a judgment for money payable from the state treasury is sought. It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought.... Thus, *the Eleventh Amendment by its*

---

**4.** In *Monaco,* the Supreme Court held that states are immune from suit in federal court by for-

eign sovereigns. *Principality of Monaco v. Mississippi,* 292 U.S. at 330, 54 S.Ct. at 751.

*terms clearly applies to a suit seeking an injunction, a remedy available only from equity.* To adopt the suggested rule, limiting the strictures of the Eleventh Amendment to a suit for a money judgment, would ignore the explicit language and contradict the very words of the Amendment itself.

*Id.* at 90–91, 102 S.Ct. at 2328–29 (footnote omitted) (emphasis added).

Therefore, based on the preceding analysis, the court finds that this action is completely barred as against the State of Idaho itself, as well as its agencies, by operation of the Eleventh Amendment.

### C. *Motion to Dismiss as Relates to Individual State Officials*

With respect to the individual defendants acting in their official capacity, the court first notes *Pennhurst State School & Hosp. v. Halderman, supra,* in which the Supreme Court declared:

The Eleventh Amendment bars a suit against state officials when "the state is the real, substantial party in interest." ... Thus, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign *if the decree would operate against the latter.*" ... And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred *regardless of whether it seeks damages or injunctive relief.*

*Id.* 465 U.S. at 101–02, 104 S.Ct. at 908–09 (citations omitted) (emphasis added).

■ There is an exception to this general rule where a suit challenges the constitutionality of a state official's action in attempting to enforce a statute which is alleged to violate federal law. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Under such circumstances, a federal court may issue an injunction to prohibit a state official from violating federal law. Yet, the Supreme Court itself characterizes this as a *narrow* exception, which has not been expansively interpreted. *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. at 102,

104 S.Ct. at 909. In addition, such an injunction may govern an official's *future* conduct, but may not attempt to award retroactive relief. *Id.* at 102–03, 104 S.Ct. at 909–10.

In *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), a class action was brought in federal court against the director of the Michigan Department of Social Services, but the State of Michigan was not named as a defendant. The plaintiffs sought a declaratory judgment from the court. The Supreme Court held that declaratory relief is *impermissible* where such relief would

have much the same effect as a fullfledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment. The teachings of [*Great Lakes Co. v.*] *Huffman,* [319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943)] *Samuels,* [*v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)] and [*Public Service Com. v.*] *Wycoff* [344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952)] are that a declaratory judgment is not available when the result would be a partial "end run" around our decision in *Edelman v. Jordan....*

*Green v. Mansour,* 474 U.S. at 73, 106 S.Ct. at 428 (citation omitted) (emphasis added).

■ Under the circumstances of the case at hand, the court concludes that the declaratory relief sought by the Tribe *would* have the same effect as an award of damages or restitution by the court, which is not allowed under the Eleventh Amendment. In addition, by also suing the state officials to quiet title, and for declaratory judgment, the Tribe is essentially attempting to execute an "end run" around the rule in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which prohibits suits in federal court against state officials for money damages or the equivalent, under the Eleventh Amendment. It should also be noted that in *Edelman,* the Supreme Court stated that " '[W]hen the action is in essence one for the recovery of money from the state, the

state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.'" *Id.* at 663–64, 94 S.Ct. at 1356 (*quoting Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)).

Thus, based on the preceding analysis, the claims for declaratory judgment and to quiet title against the individual state officials are also barred by the Eleventh Amendment. These causes of action do not fall within the narrow exception set forth in *Ex parte Young* and its progeny. This conclusion is based on the nature of the relief sought and on the court's finding (set forth below) that because the State has been in rightful possession of the beds, banks, and waters at issue since its admission to the Union, these state officials are not violating any federal law.

▪ The remaining question is whether the prayer for an injunction against the individual defendants prevents the court from granting the Motion to Dismiss. For this prayer to survive, it must meet the criteria first established in *Ex Parte Young.* In order for the court to be able to issue an injunction against the individual defendants, to prevent them from regulating or taking any action contrary to the Tribe's claimed right of exclusive use and possession of the disputed lands and waters, notwithstanding the jurisdictional limitations of the Eleventh Amendment, the Tribe must show that the injunction is necessary to prevent the state officials from continuing to violate rights secured and protected by federal law.

The court could enjoin the individual defendants if it were to find that the State is not the rightful owner of the disputed lands and waters. Yet, the claims asserted by the Tribe are without foundation, and similar claims have often been rejected by federal courts. It has long been recognized that the ownership of land under navigable waters is an incident of sovereignty. *See Martin v. Lessee of Waddell*, 41 U.S. (16 Pet.) 367, 409–411, 10 L.Ed. 997 (1842). It is also well established that the

federal government held such lands in trust for future states, to be granted to new states as they entered the Union, so that the new states would assume sovereignty on an "equal footing" with the established states. *See State of Montana v. United States*, 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1981).

The equal footing doctrine is deeply rooted in history, and the proper application of the doctrine requires an understanding of its origins. Under English common law the English Crown held sovereign title to all lands underlying navigable waters. Because title to such land was important to the sovereign's ability to control navigation, fishing, and other commercial activity on rivers and lakes, ownership of this land was considered an essential attribute of sovereignty. Title to such land was therefore vested in the sovereign for the benefit of the whole people.... When the 13 Colonies became independent from Great Britain, they claimed title to the lands under navigable waters within their boundaries as the sovereign successors to the English Crown.... Because all subsequently admitted States enter the Union on an "equal footing" with the original 13 States, they too hold title to the land under navigable waters within their boundaries upon entry into the Union.

*Utah Div. of State Lands v. United States*, 482 U.S. 193, 195–96, 107 S.Ct. 2318, 2320, 96 L.Ed.2d 162 (1987) (citations omitted).

▪ A state's power over the beds of navigable waters is subject only to the right of the federal government to ensure that the waters remain open to interstate commerce. *State of Montana v. United States*, 450 U.S. at 551, 101 S.Ct. at 1251; *see also United States v. State of Oregon*, 295 U.S. 1, 14, 55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935). It is also recognized that prior to the admission of a state into the Union, Congress may have at times conveyed lands under its navigable waters for certain limited purposes, "[b]ut because control over the property underlying navigable waters is so strongly identified with the sovereign power of government ... it will

not be held that the United States has conveyed such land except because of 'some international duty or public exigency.'" *State of Montana v. United States,* 450 U.S. at 552, 101 S.Ct. at 1251 (citation omitted).

In *Montana,* the Supreme Court directed that:

> A court deciding a question of title to the bed of a navigable water must, therefore, begin with a *strong presumption against conveyance* by the United States ... and must *not* infer such a conveyance "unless the intention was definitely declared or otherwise made plain" ... or was rendered "in clear and especial words" ... or "unless the claim confirmed in terms embraces the land under the waters of the stream...."

*Id.* (citations omitted) (emphasis added).

In *United States v. Holt State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926), the Supreme Court addressed an Indian tribe's claim to the bed of a navigable lake in Minnesota. The lake was completely within the boundaries of the tribe's reservation, which was created by treaties before Minnesota entered the Union.

> In these treaties the United States promised to "set apart and withhold from sale, for the use of" the [Chippewa tribe], a large tract of land, Treaty of Sept. 30, 1854, 10 Stat 1109, and to convey "a sufficient quantity of land for the permanent homes" of the Indians, Treaty of Feb. 22, 1855, 10 Stat 1165.... The Court concluded that there was nothing in the treaties "which even approaches a grant of rights in lands underlying navigable waters; nor anything evincing a purpose to depart from the established policy ... of treating such lands as held for the benefit of the future State."

*State of Montana v. United States,* 450 U.S. at 552–53, 101 S.Ct. at 1251–52 (*quoting United States v. Holt State Bank,* 270 U.S. at 58–59, 46 S.Ct. at 200).

The Supreme Court reached the same conclusion on different facts in *Montana.* In *Montana,* the Crow Tribe of Montana, by tribal resolution, prohibited hunting and fishing within the borders of their reservation by anyone who was not a member of the tribe. The State of Montana continued to assert its right to regulate hunting and fishing by non-Indians within the reservation. The United States intervened in the suit on its own behalf and as fiduciary for the tribe. The United States sought,

> (1) a declaratory judgment quieting title to the bed of the Big Horn River in the United States as trustee for the Tribe, (2) a declaratory judgment establishing that the Tribe and the United States have sole authority to regulate hunting and fishing within the reservation, and (3) an injunction requiring Montana to secure the permission of the Tribe before issuing hunting or fishing licenses for use within the reservation.

*State of Montana v. United States,* 450 U.S. at 549, 101 S.Ct. at 1250.

The district court denied all claims. In doing so, the district court relied on the presumption that the federal government did not intend to convey title to navigable waters and the lands beneath them. In applying that presumption to the facts of that case, the district court concluded that the language of the treaties and other factual circumstances were insufficient to overcome the presumption. *Id.*

The Ninth Circuit reversed the district court on the grounds that the 1868 treaty caused the beds and banks of the river to be held by the United States in trust for the tribe. The Supreme Court then reversed the Ninth Circuit decision. The Supreme Court first noted that the treaty of 1868 described the reservation land in detail:

> "[C]ommencing where the 107th degree of longitude west of Greenwich crosses the south boundary of Montana Territory; thence north along said 107th meridian to the mid-channel of the Yellowstone River; thence up said mid-channel of the Yellowstone to the point where it crosses the said southern boundary of Montana, being the 45th degree of north latitude; and thence east along said parallel of latitude to the place of beginning...."

Second Treaty of Fort Laramie, May 7, 1868, Art II, 15 Stat 650.

*Id.* at 553, n. 4, 101 S.Ct. at 1252, n. 4. The treaty further specified that the reservation land was set aside for the absolute and undisturbed use and occupation of the tribe. *Id.* at 553, 101 S.Ct. at 1252.

Although the treaties which created the Crow reservation described the reservation land in detail, including a boundary which extended to the middle of the channel of a section of the Yellowstone River, the Supreme Court in *Montana* held that all the treaties did was reserve the designated land in a general way to ensure the continued occupation of the Indians in what remained of their ancestral territory. *Id.* at 554, 101 S.Ct. at 1252. Thus, the Supreme Court concluded that the treaties of 1851 and 1868 which created the Crow reservation did not have language sufficient to overcome the strong presumption against conveyance of the beds and banks of navigable waters within the reservation.

> The mere fact that the bed of a navigable water lies within the boundaries described in the treaty does not make the riverbed part of the conveyed land, especially when there is no express reference to the riverbed that might overcome the presumption against its conveyance.... [T]he United States retains a navigational easement in the navigable waters lying within the described boundaries for the benefit of the public, regardless of who owns the riverbed. Therefore, such phrases ... as "absolute and undisturbed use and occupation" and "no persons[ ] except those herein designated ... shall ever be permitted," whatever they seem to mean literally, do not give the Indians the exclusive right to occupy all the territory within the described boundaries....
>
> ....
>
> For these reasons, we conclude that title to the bed of the Big Horn River passed to the State of Montana upon its admission into the Union....

*Id.* at 554–56, 101 S.Ct. at 1252–54 (citations omitted).

■ In the case at hand, the Tribe claims that because the Executive Order executed on November 8, 1873, described part of the boundary of the reservation as extending to the center of the channel of the Spokane River, the Tribe is therefore entitled to exclusive possession and use of all the lands underneath, as well as the banks and beds of *all* navigable waters within the boundaries of the reservation. This assertion is indefensible and is contrary both to the clear holding in *Montana,* and the *strong presumption* in favor of these lands being conveyed to the State of Idaho upon its entry into the Union.

The 1873 executive agreement with the Coeur d'Alene Tribe and the formal agreement ratified in 1891 had many similarities to the 1868 treaty with the Crow tribe at issue in the *Montana* case: (1) the agreements with the Coeur d'Alene Tribe also described the reservation lands in detail; (2) one boundary of the reservation was set in the middle of a river (the Spokane River); (3) the reservation lands were set aside in a general way, to be held forever as Indian lands, never to be sold, opened to white settlement, or otherwise disposed of without the consent of the Tribe; and (4) there was no express conveyance or other reference to the beds or banks of navigable waters which would overcome the strong presumption against such conveyance.

The court is bound to interpret the 1873 agreement and the formal agreement ratified in 1891, which extended one boundary of the reservation to the center of a portion of the Spokane River, the same way that the Supreme Court interpreted the treaty with the Crow tribe in the *Montana* case, which had similar provisions. Therefore, because the agreements with the Coeur d'Alene Tribe made no express conveyance of the beds and banks of navigable waters within the reservation, or any other references which could be construed as having done so, the court finds that there is nothing in the agreements which overcomes the strong presumption that these lands were held in trust by the United States and conveyed to the State of Idaho upon its admission to the Union on an "equal foot-

ing" with the other states.[5]

Therefore, the court finds that the State of Idaho has been in rightful possession of all of the lands and waters at issue in this case since it entered the Union in 1890. Consequently, the Tribe is not entitled to an injunction against the individual defendants in either their official or individual capacities.

### D. Title 42 U.S.C. § 1983 Claim

■ Based on the reasons stated above, the plaintiffs' Title 42 U.S.C. § 1983[6] claim also fails. First, the Section 1983 action against the State of Idaho is barred by the Eleventh Amendment. In *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the Supreme Court held that Section 1983 did not override the sovereign immunity guaranteed to the states by the Eleventh Amendment. *Id.* at 342–43, 99 S.Ct. at 1146–47. This decision was reaffirmed in *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), where the Court declared:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity ... or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity. That Congress, in passing § 1983, had no intention

to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect was made clear in our decision in *Quern*.

*Id.* at 66, 109 S.Ct. at 2309.

■ Second, the court finds that the Tribe may not bring a Section 1983 action because it is not a "citizen of the United States or other person" for purposes of Section 1983. Therefore, the remaining issue is whether the Section 1983 claim brought by the individual plaintiffs against the state officials can survive the Motion to Dismiss.

The court has determined that the State of Idaho is and always has been in rightful possession of the beds, banks, and waters of all of the navigable watercourses at issue in this case. Because of this conclusion, the Section 1983 claim against the individual defendants, both in their official and individual capacity, is barred because the plaintiffs are not being deprived of any rights, privileges, or immunities secured by the Constitution and laws of the United States.

Thus, for the foregoing reasons, the court concludes that this entire action should be dismissed.

## III. ORDER

Based on the foregoing, and the court being fully advised in the premises,

IT IS HEREBY ORDERED that the Motion to Dismiss filed on November 13, 1991, should be, and is hereby, GRANTED. All

---

**5.** The Tribe's claim to the banks and beds of the navigable waters within the reservation is based almost exclusively on the fact that one portion of the original reservation boundary extended to the middle of the Spokane River. As noted above, the court finds that this claim is contrary to long-established and well-recognized law. In addition, the court notes that this claim is especially weak because an area of the reservation, including this section of the Spokane River, was ceded by the Tribe to the United States by an agreement executed in 1889.

The court further notes that the agreements with the Tribe were not formally ratified by Congress until March 3, 1891, eight months *after* Idaho was admitted to the Union. It is well established that Congress cannot convey a

state's submerged lands to other parties after statehood. *See Shively v. Bowlby*, 152 U.S. 1, 27, 14 S.Ct. 548, 558, 38 L.Ed. 331 (1894).

**6.** Section 1983 provides as follows:

Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any *citizen* of the United States or other *person* within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (Law. Co-op.1990).

claims brought by the plaintiffs in this action are hereby DISMISSED.