872 F.2d 1384
 NATIVE VILLAGE OF NOATAK; Circle Village, Plaintiffs-Appellants,
and
Native Village of Akiachak, Plaintiff,
v.
David HOFFMAN, as Commissioner, Department of Community and
Regional Affairs, State of Alaska, Defendant-Appellee.
 Nos. 87-4310, 87-4374.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 3, 1988.
Decided March 30, 1989.
 
 Lawrence A. Aschenbrenner and Robert T. Anderson, Anchorage, Alaska, for plaintiffs-appellants.
 Gary I. Amendola and Douglas K. Mertz, Asst. Attys. Gen., Juneau, Alaska, for defendant-appellee Hoffman.
 Appeal from the United States District Court for the District of Alaska.
 Before KOZINSKI, NOONAN and THOMPSON, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 The Native Village of Noatak, the Native Village of Akiachak and Circle Village brought this action against the Commissioner of the Department of Community and Regional Affairs of the State of Alaska (the Commissioner). The district court dismissed the case for want of jurisdiction. The Native Village of Noatak and Circle Village (the Native Villages) appeal to this court. We reverse and remand.
 
 The Parties
 
 2
 Noatak is a government with a local governing board organized under the Indian Reorganization Act, 25 U.S.C. Sec. 461 et seq. Circle Village has a traditional Council form of government. The defendant Commissioner is the principal officer of a department of the state of Alaska, responsible for administering the payment of revenue-sharing funds.
 
 The Causes of Action
 
 3
 The Native Villages allege that they have been authorized to receive their pro rata share of the funds appropriated by the Alaska Legislature, up to $25,000, in accordance with Alaska Stat. Secs. 29.89.010 and 29.89.050, which provided, "the state shall pay $25,000 to a Native Village government for a village which is not incorporated as a city under this title." Alaska Stat. Sec. 29.89.050 (1980). The plaintiffs allege that the Commissioner deliberately expanded the class of eligible recipients to include entities other than the Native Villages solely because of the racial ancestry of the individual members of the villages, in violation of the federal Constitution, of 42 U.S.C. Sec. 1983 and of federal common law authorizing discrete treatment of Indian tribes, with the result that their share was diluted.
 
 
 4
 As a second cause of action the Native Villages assert that in so diluting the funds available the Commissioner violated federal laws and policy intended to further tribal self-government, including the Indian Reorganization Act, 25 U.S.C. Sec. 461 et seq.; the Indian Civil Rights Act of 1968, 25 U.S.C. Secs. 1301-1341; the Indian Financing Act of 1974, 25 U.S.C. Secs. 1451 et seq.; the Indian Self-Determination and Education Assistance Act, 25 U.S.C. Secs. 450 et seq.; the Indian Health Care Improvement Act, 25 U.S.C. Secs. 1601-1680 and the Indian Child Welfare Act of 1978, 25 U.S.C. Sec. 1901 et seq.
 
 
 5
 As a third cause of action the Native Villages allege that the Commissioner's conduct also violated 25 U.S.C. Sec. 476, which, they contend, grants native tribes the unrestricted right to contract with states. As a fourth cause of action the Native Villages claim that the Commissioner's conduct violated the First Amendment by destroying native culture and therefore their most basic form of expression, religion and association. Four additional claims are put forward as pendent state claims. The plaintiffs seek an order directing the Commissioner to pay over the monies appropriated by the Legislature and an injunction prohibiting further administration of the statute in a way that would preclude the plaintiffs from receiving a full share.
 
 Proceedings
 
 6
 The district court held that the court did not have jurisdiction because the plaintiffs' suit was barred by the eleventh amendment or because, in the alternative, the case did not arise under the Constitution, laws or treaties of the United States. This appeal followed.
 
 Analysis
 
 7
 1. The Sovereign Immunity of the State of Alaska
 
 
 8
 The Commissioner contends that the eleventh amendment was properly applied by the district court to deny jurisdiction. The eleventh amendment by its terms does not bar suit in the federal courts against a state by its own citizens. In Hans v. Louisiana, 34 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), it was held that a state could not be sued by one of its own citizens seeking to make it perform its contracts but that "any attempt on its part to violate property or rights acquired under its contracts may be judicially resisted." Id. at 20-21, 10 S.Ct. at 509. The opinion appears to rest as much on a reading of Article III of the Constitution as on a judicial expansion of the terms of the eleventh amendment. Nonetheless since the date of its decision it has been customary to think of Hans as extending the eleventh amendment to bar suits against a state by its own citizens. See, e.g., Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).
 
 
 9
 The continued vitality of Hans is in question, both by reason of the arguments directed against it and by the actual vote in Welch v. Texas Dept. of Highways, 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). With the court divided four to four and Justice Scalia declaring that he was unwilling to address Hans, it is not clear how long Hans will remain good law. We are, however, obliged to apply Hans in this case.
 
 
 10
 Whether the eleventh amendment bars an Indian tribe from suing a state is not apparent from its text, which refers only to suits against a state by citizens of another state or of a foreign state. The fundamental opinion of Chief Justice Marshall holds that an Indian tribe is not a foreign state that could bring a suit in the Supreme Court under Article III of the Constitution; rather, Indian tribes are "domestic dependent nations." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). By the same reasoning an Indian tribe is not embraced within the literal language of the eleventh amendment. On the other hand, the structure of the opinion in United States v. Minnesota, 270 U.S. 181, 193, 46 S.Ct. 298, 300, 70 L.Ed. 539 (1926), points to a bar against suit by an Indian tribe. But Arizona v. California, 460 U.S. 605, 614, 103 S.Ct. 1382, 1388, 75 L.Ed.2d 318 (1983), indicates that the matter is still open. We assume without deciding that the state does enjoy immunity unless it has been overridden by action of the United States.
 
 
 11
 2. Congressional Action Overriding the Sovereignty of Alaska.
 
 
 12
 28 U.S.C. Sec. 1362 provides that the district courts "shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."
 
 
 13
 Two questions arise as to the applicability of this statute. The first is whether the Native Villages have been "duly recognized by the Secretary of the Interior." The Native Villages represent bodies of Indians of the same race united in a community under a single government in a particular territory--Noatak at Bering Strait, Circle Village at Upper Yukon-Porcupine. They therefore meet the basic criteria to constitute Tribes. Montoya v. United States, 180 U.S. 261, 266, 21 S.Ct. 358, 359-60, 45 L.Ed. 521 (1901).
 
 
 14
 No statute expressly outlines how a tribe may become duly recognized for purposes of Sec. 1362 jurisdiction. In Price v. State of Hawaii, 764 F.2d 623, 626 (9th Cir.1985), this court left open the question whether formal organization or incorporation of a tribe followed by approval of the organization or incorporation by the Secretary of the Interior constituted being "duly recognized" for the purpose of the statute. We see no reason to suppose that the Secretary of the Interior needs to issue a special document conferring a right to sue under the statute. Noatak Village has a governing body approved by the Secretary. 25 U.S.C. Sec. 476. It is therefore a tribe with a duly recognized governing body and qualifies for the benefits of Sec. 1362.
 
 
 15
 Circle Village, like Noatak, is listed as a Native Village in the Alaska Native Claims Act, 43 U.S.C. Sec. 1610(b)(1). The purpose of this Act was to make "a fair and just settlement of all claims by Natives and Native Groups of Alaska, based on aboriginal land claims." 43 U.S.C. Sec. 1601(a). The Villages acknowledged by the Act were distinguished from ineligible villages "of a modern and urban character," where the majority of the residents were not natives. 43 U.S.C. Sec. 1610(b)(2), (3). The Villages acknowledged by the Act were possessed of aboriginal land claims and became eligible for the benefits provided under the Act. The Act was congressional recognition of the Native Villages.
 
 
 16
 In addition, in three recently enacted statutes--the Indian Self-Determination Act, 25 U.S.C. Sec. 450(b); the Indian Financing Act, 25 U.S.C. Sec. 1452(c), and the Indian Child Welfare Act, 25 U.S.C. Sec. 1903(8)--Congress treated the Native Villages as Indian tribes. Arguably, Congress intended to confer recognition only for the particular purposes of each piece of legislation. See, e.g., Alaska v. Native Village of Venetie, 856 F.2d 1384, 1386-87 (9th Cir.1988) (recognition under Indian Reorganization Act not conclusive as to tribal status). But the nature and scope of the federal government's relationship with the Native Villages, as evidenced by these Acts, indicates that the recognition extends to legal claims.
 
 
 17
 It is true that Sec. 1362 speaks of recognition by the Secretary of the Interior, not Congress, but the Secretary is only using power delegated by Congress. If Congress has recognized the tribe, a fortiori the tribe is entitled to recognition and is in fact recognized by the Secretary of the Interior. Consequently, Circle Village, as well as Noatak, qualifies under Sec. 1362.
 
 
 18
 The second question presented as to Sec. 1362 is whether in this case, assuming a federal question is presented, the statute overrides the immunity of the state. The Second Circuit has recognized the statute as containing a broad grant of jurisdiction over federal question suits brought by tribes. Oneida Indian Nation v. New York, 691 F.2d 1070, 1080 (2d Cir.1982). To the contrary is the Eighth Circuit. Standing Rock Sioux Indian Tribe v. Dorgan, 505 F.2d 1135, 1140 (8th Cir.1974).
 
 
 19
 For the Eighth Circuit, Judge Webster reasoned that the only purpose of the statute was to let tribes sue to protect "their federally derived property rights," and that, to obtain jurisdiction, a tribe's complaint must make an allegation "which would have made the United States the real party in interest even if the United States had brought the action as Trustee." Standing Rock Sioux Indian Tribe v. Dorgan, 505 F.2d at 1140. Judge Webster further noted that the United States had not waived its own sovereign immunity by enacting Sec. 1362 and that there was equally no reason to believe that the statute abrogated the sovereign immunity of the several states. Id.
 
 
 20
 This line of reasoning is not persuasive. As will be seen below, the right of the United States to act as a trustee is not confined to "federally derived property rights." There is, moreover, inconsistency in saying that the United States must be "the real party in interest" and have a "direct interest" Standing Rock Sioux Indian Tribe v. Dorgan, 505 F.2d at 1140, and at the same time acknowledging that if the United States sued it would be as a trustee with the real interest necessarily being that of the tribal beneficiaries. Finally, there is no parallel between the immunity of the United States and the immunity of the several states. The interest of the United States as a trustee in empowering its wards to sue the individual states is of a very different character from the United States as trustee consenting to suits against itself. We turn, therefore, to the reasons advanced by Judge Mansfield for the Second Circuit.
 
 
 21
 Part of Judge Mansfield's reasoning rested on the grant of power by the states to Congress to "regulate commerce ... with the Indian tribes," U.S. Const., art. I, Sec. 8, cl. 3, and the conclusion from this grant that the states had necessarily "surrendered a portion of their sovereignty as to suit by Indian tribes." Oneida Indian Nation, 691 F.2d at 1079 (quoting Parden v. Terminal Railway, 377 U.S. 184, 191, 84 S.Ct. 1207, 1212, 12 L.Ed.2d 233 (1964)). The reasoning of Parden was rejected in Welch v. State Dept. of Highways, 483 U.S. 468, 107 S.Ct. 2941, 2948, 97 L.Ed.2d 389 (1987). In order to abrogate a state's immunity, Congress must express its intention "in unmistakably clear language." Welch, 107 S.Ct. at 2948; see also Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 243, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985).
 
 
 22
 Does Sec. 1362 express an unmistakable intention? Statutes passed for the benefit of Indian Tribes " 'are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' " Bryan v. Itasca County, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (quoting Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918)). The Supreme Court has held that Sec. 1362 "suggests that in certain respects tribes suing under this section were to be accorded treatment similar to that of the United States had it sued on their behalf." Moe v. Salish & Kootenai Tribes, 425 U.S. 463, 474, 96 S.Ct. 1634, 1642, 48 L.Ed.2d 96 (1976). We read Sec. 1362, thus authoritatively interpreted, to mean that the statute does authorize Indian tribes to sue where the United States could sue on their behalf.
 
 
 23
 The United States could bring suit on the causes of action alleged here. The standard was established long ago. In the Cherokee Nation case, Chief Justice Marshall observed that the relation between the Indian tribes and the United States "resembles that of a ward to his guardian. They look to our government for protection." Cherokee Nation v. Georgia, supra at 17. The analogy was suggestive and effective in imposing fiducary obligations upon the United States. The dependence of the tribes generated "the duty of protection." United States v. Thomas, 151 U.S. 577, 585, 14 S.Ct. 426, 429, 38 L.Ed. 276 (1894); United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886).
 
 
 24
 Speaking specifically of the relation of the United States to the Cherokees but using language applicable to the relationship between the United States and any Indian tribe, Justice Hughes wrote that as long as the United States is the guardian of the Indians, "the right and duty of the Nation to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid." Heckman v. United States, 224 U.S. 413, 437, 32 S.Ct. 424, 431, 56 L.Ed. 820 (1912). Addressing the right of the United States as the guardian of non-competent Osage Indians, Chief Justice White upheld the right of the United States to sue "to prevent the systematic violation of the state law committed for the purpose of destroying the rights created by the Acts of Congress." United States v. Board of County Commissioners, 251 U.S. 128, 133, 40 S.Ct. 100, 101, 64 L.Ed. 184 (1919).
 
 
 25
 The general proposition is drawn from these cases "that the United States, by virtue of its special relationship with the Indians, has standing to effectuate federal policies by enforcing Indian rights arising out of that relationship." Cohen's Handbook of Federal Indian Law (1982) p. 308. The federal oversight of Indian affairs is an "exclusive and compelling interest." See Housing Authority v. Washington, 629 F.2d 1307, 1313 (9th Cir.1980) (per Anderson, J.). Each of the four federal causes of action here alleged involve that interest.
 
 
 26
 The United States is not barred by the immunity of any single state. Monaco v. Mississippi, 292 U.S. 313, 319, 54 S.Ct. 745, 746, 78 L.Ed. 1282 (1934). Consequently, if the United States could bring these actions as the trustee of an Indian tribe, the tribes may sue a state under section 1362. The United States, we have concluded, could sue as a trustee on behalf of the tribe to vindicate the rights in the several causes of action here. Consequently the case should not have been dismissed on the ground of the immunity of the state.
 
 
 27
 3. The Federal Causes of Action.
 
 
 28
 The state maintains that the plaintiffs have not alleged federal causes of action. Obviously there was no duty on the part of Alaska to vote a bonus of $25,000 to each Native Village. Once having voted the bonus, however, the state could not take it away or dilute it on grounds violative of the fourteenth amendment. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), reh'g denied, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). The plaintiffs allege that such a racially based dilution is what has occurred.
 
 
 29
 The state's answer is, "How can this be? We were giving a bonus to Native Villages whose membership was formed on a racial basis. We got away from the racial basis by making a nonracial criterion the ground for the distribution." The plaintiffs' answer is that the original scheme of the bonus was based on their identity as political entities. To wipe out their political status on the ground that that status had an ethnic origin is itself a violation of the constitutional command not to discriminate on the basis of race. Paradoxical as it is, the allegation that the move from a tribal basis to a non-tribal basis for the bonus was racially discriminatory is an intelligible claim. Any governmental action based on the racial character of those affected is presumptively invalid. Washington v. Seattle School District No. 1, 458 U.S. 457, 485, 102 S.Ct. 3187, 3202-03, 73 L.Ed.2d 896 (1982). Alleging that such discrimination has happened here, the Native Villages have presented a claim which is neither plainly meritless under the Constitution nor foreclosed by prior cases. Cf. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Whether these allegations state a claim upon which relief can be granted is beside the point at this stage of the case. Bell v. Hood, 327 U.S. 678, 678-82, 66 S.Ct. 773, 773-76, 90 L.Ed. 939 (1946). The scope of our present inquiry is limited to a determination of whether the district court had jurisdiction. We hold that it did.
 
 
 30
 The Villages also properly invoked federal subject matter jurisdiction by their allegation that the Commissioner violated federal laws and policies intended to further tribal self-government. If, as they contend, the Commissioner acted because he believed that Native Villages could not receive special benefits from the state, the Commissioner did act in an area where the action may be found to have been preempted by federal law. White Mt. Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Similar conclusions follow as to the third and fourth causes of action where again it may be found that the action of the Commissioner was such as to deny the political reality of the Native Villages because of the Commissioner's view of their racial composition. The pendent claims are cognizable if the four federal claims confer jurisdiction. Accordingly, the decision of the district court is REVERSED and the case REMANDED for further proceedings.
 
 
 31
 KOZINSKI, Circuit Judge, dissenting.
 
 
 32
 I am unable to join my colleagues in exploring the boundaries of the eleventh amendment because I do not agree that the district court had subject matter jurisdiction. Subject matter jurisdiction and sovereign immunity are both threshold inquiries, but the former presents a far easier question and I would therefore dispose of the case on those grounds. While I don't necessarily disagree with the majority's analysis of the eleventh amendment issue, the question is a close one, having already caused a split in the circuits; I would await a case where our jurisdiction is more secure before expounding on this difficult point. I must therefore respectfully dissent.
 
 
 33
 To state a federal claim, it is not enough to invoke a constitutional provision or to come up with a catalogue of federal statutes allegedly implicated. Rather, as the Supreme Court has repeatedly admonished, it is necessary to state a claim that is substantial: "[T]he federal courts are without power to entertain claims otherwise within their jurisdiction if they are 'so attenuated and unsubstantial as to be absolutely devoid of merit,' 'wholly insubstantial,' 'obviously frivolous,' 'plainly unsubstantial,' or 'no longer open to discussion.' " Hagans v. Lavine, 415 U.S. 528, 536-37, 94 S.Ct. 1372, 1378-79, 39 L.Ed.2d 577 (1974) (citations omitted). We do not have jurisdiction over a claim, no matter how federal it purports to be, that is " 'patently without merit, or so insubstantial, improbable, or foreclosed by Supreme Court precedent as not to involve a federal controversy.' " City of Las Vegas v. Clark County, 755 F.2d 697, 701 (9th Cir.1985) (quoting Demarest v. United States, 718 F.2d 964, 966 (9th Cir.1983), cert. denied, 466 U.S. 950, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984)).
 
 
 34
 While this doctrine has been criticized, see, e.g., Hagans, 415 U.S. at 538, 94 S.Ct. at 1379; Rosado v. Wyman, 397 U.S. 397, 404, 90 S.Ct. 1207, 1213, 25 L.Ed.2d 442 (1970); Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), it serves an important practical purpose: It prevents plaintiffs from using a federal court's pendent jurisdiction to propel state claims into federal court by attaching them to meritless federal claims. See Hagans, 415 U.S. at 555, 94 S.Ct. at 1388 (Rehnquist, J., dissenting); Siler v. Louisville & Nashville R.R., 213 U.S. 175, 191-92, 29 S.Ct. 451, 454-55, 53 L.Ed. 753 (1909). And that is precisely what's happening here.
 
 
 35
 In 1980, the Alaska Legislature enacted a revenue sharing program according to which all unincorporated communities with a Native village government would receive $25,000 a year. The following year, the state Attorney General advised the Department of Community and Regional Affairs, the state agency responsible for implementing the program, that the program violated the equal protection and public purpose clauses of the Alaska Constitution, art. I, Sec. 1 and art. IX, Sec. 6. In order to comply with the state constitution, the Department made the funds available to all unincorporated communities, whether or not they had Native village governments. The appellants, whose share of the pie may have been diminished when the class of recipients was broadened, disagreed with the Attorney General's analysis and filed this suit.
 
 
 36
 The villages' purported federal claim is that the state, once having decided to favor Indians over other citizens, is now precluded from treating them the same. As a matter of federal equal protection, this claim is frivolous: I am aware of no constitutional provision that requires a state to treat Indians and non-Indians differently. While the equal protection clause may permit states to favor Indians, it certainly does not compel it. The villages' equal protection claim is not aided in any way by the fact that the state Attorney General's equality requirement is based on the Alaska Constitution; the federal equal protection clause does not preclude the states from adopting constitutional provisions that guarantee equal treatment for their citizens.
 
 
 37
 Equally frivolous are the villages' claims based on various federal statutes intended to further tribal self-government. The Indian Reorganization Act, 25 U.S.C. Secs. 461-92 (1982 & Supp. IV 1986), comprises a hodgepodge of statutes relating to land transfer and tribal organization. The Indian Civil Rights Act of 1968, Pub.L. 90-284, 82 Stat. 77-80 (codified as amended in scattered sections of title 25), extends a number of federal constitutional rights to members of Indian tribes and authorizes state courts to assume jurisdiction over certain causes of action arising on Indian reservations. The Indian Financing Act of 1974, Pub.L. 93-262, 88 Stat. 77 (codified as amended in scattered sections of title 25), provides credit to members of Indian tribes. The Indian Self-Determination and Education Assistance Act, Pub.L. 93-638, 88 Stat. 2203 (codified as amended in scattered sections of titles 5, 25, 42 & 50), provides federal assistance for, among other things, tribal governments and school districts educating tribe members. The Indian Health Care Improvement Act, Pub.L. 94-437, 90 Stat. 1400 (codified as amended in scattered sections of title 25), as its name implies, relates to health care. The Indian Child Welfare Act of 1978, Pub.L. 95-608, 92 Stat. 3069 (codified as amended in scattered sections of title 25), includes provisions covering child custody proceedings and federal assistance for various family-related programs. Many of these statutes provide money to Indian tribes, but that is the full extent of their relevance to this lawsuit. By no stretch of the imagination do they preempt state constitutional provisions calling for equal treatment of Indians and non-Indians.
 
 
 38
 The villages' third and fourth federal causes of action are similarly insubstantial. Section 476 of title 25 permits Indian tribes to organize, adopt a constitution, and negotiate with the federal, state and local governments. It is difficult to ascertain exactly how this statute could be violated by diluting the villages' share of state revenues. The villages' contention that the dilution extinguished their powers of self-government and destroyed their Native culture, in violation of the first amendment, is hyperbole.
 
 
 39
 Even under the most generous construction of the federal Constitution and title 25 of the United States Code, the four federal claims fit any of the Hagans formulations of insubstantiality: They are "obviously frivolous;" they are "plainly unsubstantial;" they are "absolutely devoid of merit." They serve a single purpose: to transport state claims into federal court. I would accordingly affirm the district court's dismissal for lack of a substantial federal question and save the difficult eleventh amendment issue for another day. Judging from the state's relationship with the villages, that day may be coming soon enough.