**LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; Red Cliff Band of Lake Superior Chippewa Indians; Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin; St. Croix Chippewa Indians of Wisconsin; Bad River Band of the Lake Superior Chippewa Indians; Lac Du Flambeau Band of Lake Superior Chippewa Indians, Plaintiffs,**

v.

**STATE OF WISCONSIN, Wisconsin Natural Resources Board, Carroll D. Besadny, James Huntoon, and George Meyer, Defendants.**

**No. 74–C–313–C.**

United States District Court, W.D. Wisconsin.

Oct. 11, 1990.

As Amended Oct. 22, 1990.

Tracey Schwalbe, Hayward, Wis., for Lac Courte Oreilles.

Howard Bichler, St. Croix Tribal Council, Hertel, Wis., for St. Croix Chippewa Indians.

Joseph L. Young, Tribal Atty., Lac Du Flambeau Band, Lac Du Flambeau, Wis., for Lac Du Flambeau Band.

Earl Charlton, Milwaukee, Wis., for Mole Lake Band.

Milton Rosenberg, Madison, Wis., for Red Cliff Band.

David J. Siegler, Odanah, Wis., for Bad River Band.

James L. Beck, Wisconsin Judiciare Inc., Wausau, Wis., for Wisconsin Judicare Inc.

P. Scott Hassett, Madison, Wis., for amicus plaintiff.

Thomas L. Dosch, Philip Peterson, Lisa Levin, Asst. Attys. Gen., Madison, Wis., for State of Wis.

## OPINION AND ORDER

CRABB, Chief Judge.

Plaintiffs brought this action under 28 U.S.C. § 1362 and 42 U.S.C. § 1983, as political successors in interest to the Lake Superior Chippewa, claiming usufructuary rights on territory ceded to the United States by the Lake Superior Chippewa by treaties of 1837 and 1842. Plaintiffs are seeking a declaratory judgment concerning their off-reservation usufructuary hunting, fishing, and gathering rights under the treaties; injunctive relief concerning permissible state regulation of any such treaty rights; and restitution and damages for the past deprivation of their treaty rights.

In the first, or declaratory, phase of this case, it was determined that plaintiffs have certain continuing off-reservation usufructuary rights in the ceded territory. *Lac Courte Oreilles Chippewa Indians v. State of Wisconsin*, 653 F.Supp. 1420 (W.D.Wis.1987). In Phase II, the regulatory phase, the parties have been litigating the extent to which the State of Wisconsin may regulate plaintiffs' usufructuary rights. Phase III is intended to focus on plaintiffs' right to monetary relief.

The case is before the court on defendants' motion for partial summary judgment as to plaintiffs' monetary claims against defendants. Defendants want the court to reconsider the 1984 ruling made by Judge Doyle in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 595 F.Supp. 1077 (W.D.Wis.1984), that Congress abrogated the states' immunity to suits by Indians when it enacted 28 U.S.C. § 1362. Defendants contend that the basis of that ruling has been undermined by the stricter standard for abrogation articulated by the United States Supreme Court in recent opinions.

Defendants contend also that the individual defendants in this case are entitled to qualified immunity. In the alternative, defendants request application of the principle of prospectivity of judicial decisions to defeat plaintiffs' claims for retrospective monetary relief. Finally, defendants contend that certain of plaintiffs' claims are

barred by the statute of limitations in 28 U.S.C. § 2415.

I conclude that defendants are correct in challenging the continuing vitality of Judge Doyle's 1984 ruling that Congress abrogated the states' sovereign immunity in enacting § 1362. In light of more recent Supreme Court rulings and the exacting requirements that the Court now imposes to find Eleventh Amendment abrogation, that ruling cannot stand. The consequence is that plaintiffs cannot pursue their claim for damages against the State of Wisconsin directly; they may do so only through the United States.

Plaintiffs have not alleged any damage claims against the individual defendants. Therefore, it is unnecessary to address the affirmative defense that defendants are entitled to qualified immunity for any actions they took before 1985 to enforce state regulations. I do not reach defendants' alternative arguments based on the doctrine of prospectivity and the statute of limitations.

## OPINION

■ As a general rule, trial courts treat their own previously decided issues as establishing "the law of the case," which means they are not open to reconsideration. Doing so "protects the ability of the court to build to its final judgment by cumulative rulings, with reconsideration or review postponed until after the judgment is entered." 1B Moore's Federal Practice, para. 0.404[4.–2] at 126 (2d Ed.) However, it is well established that a district court may reconsider its interlocutory orders when there are convincing reasons for doing so. "[T]he doctrine of the law of the case ... is not a rule to perpetuate error." *Id.* Defendants have raised compelling arguments in support of their motion for partial summary judgment that warrant review of the earlier decision that the state is not protected by Eleventh Amendment immunity from plaintiffs' claims for money damages.

The Eleventh Amendment provides that The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States

by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const., amend. XI. Although this amendment makes no mention of suits against a state by its own citizens and says nothing about sovereign immunity, it has been interpreted as precluding suits against a state by its own citizens, *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and as affirming "the fundamental principle of sovereign immunity [that] limits the grant of judicial authority in Art. III" of the Constitution. *Pennhurst State Schools & Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984).

Scholars have argued convincingly that the amendment was never intended to carry this weight: it was designed merely to "deny that the identity of the parties could serve as a basis of jurisdiction when a state was sued by a noncitizen or an alien." Shapiro, *Wrong Turns: The Eleventh Amendment and the Pennhurst Case*, 98 Harv.L.Rev. 61 (1984). *See also* Gibbons, *The Eleventh Amendment and State Sovereign Immunity; A Reinterpretation*, 83 Colum.L.Rev. 1889 (1983) (arguing that the Eleventh Amendment was not viewed at the time of its enactment as the reinstatement of an original understanding of state sovereign immunity, because the states had no such understanding, and that the modern sovereign immunity construction given the amendment stems from an 1890 "rewriting" of the amendment to respond to political exigencies); Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction*, 35 Stan.L. Rev. 1022 (1984). In addition, a four-member minority of the Supreme Court (Justices Brennan, Stevens, Blackmun and Marshall) has argued persistently that the Eleventh Amendment was not intended to constitutionalize a broad principle of state sovereign immunity, but that it was intended only to reverse the result in *Chisholm v. Georgia*, 2 Dall. 419, 1 L.Ed. 440 (1793). *Chisholm* was an early diversity case in

which a citizen of South Carolina sued the state of Georgia for the price of military goods he had sold to the state. It raised the question whether a suit against a state that could not have been maintained in state court could be brought in federal court under diversity; it did not raise the question whether a state could be sued in federal court where the cause of action arose under federal law. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 281–86, 105 S.Ct. 3142, 3167–70, 87 L.Ed.2d 171 (1985) (Brennan, J., dissenting). Nevertheless, the majority of the Court has shown no sign of abandoning its view of the Eleventh Amendment. Indeed, in recent years the Court has emphasized the importance of the state sovereign immunity recognized in the amendment by setting more exacting standards for finding congressional intent to overcome the states' immunity to suit.

It is well-settled law that Congress may abrogate the Eleventh Amendment immunity of the states by enacting legislation pursuant to its enforcement powers under the Fourteenth Amendment, and possibly when acting pursuant to other powers enumerated in Article I of the Constitution. *Welch v. Texas Highways & Public Transp. Dep't,* 483 U.S. 468, 475 and n. 5, 107 S.Ct. 2941, 2947 and n. 5, 97 L.Ed.2d 389 (1987). In a series of cases decided since 1984, the Supreme Court has focused on determining whether Congress intended to abrogate the states' Eleventh Amendment immunity in enacting a particular statute. The consistent theme of these decisions is that abrogation must be explicit. District courts are not to look behind the language of the statute to infer such an intent from the legislative history.

In 1985, for example, the Court ruled that before finding that federal law overrides the guarantees of the Eleventh Amendment, "it is incumbent upon the federal courts to be certain of Congress' intent" noting that "[t]he requirement that Congress unequivocally express this intention in the statutory language ensures such certainty." *Atascadero State Hosp. v. Scanlon,* 473 U.S. at 243, 105 S.Ct. at 3147. More recently, the Court has made this requirement even clearer by stating,

Legislative history generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment. If Congress' intention is "unmistakably clear in the language of the statute," recourse to legislative history will be unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile, because by definition the rule of *Atascadero* will not be met.

*Dellmuth v. Muth,* 491 U.S. 223, 109 S.Ct. 2397, 2401, 105 L.Ed.2d 181 (1989) (citations omitted).

One of the criticisms of the Court's approach to determining whether Congress intended abrogation is that it is applied to statutes passed long before Congress could have known of the requirement that it declare explicitly its intention to abrogate the states' immunity from suit. As Justice Brennan noted in a dissenting opinion in *Dellmuth:*

> The effect of retroactively applying the Court's peculiar rule will be to override congressional intent to abrogate immunity, though such intent was absolutely clear under principles of statutory interpretation established at the time of enactment. Retroactive application of new drafting regulations in such circumstances is simply unprincipled.

109 S.Ct. at 2406 (Brennan, J., dissenting).

Despite criticism of its approach, the Court has been disinclined to change it. It has turned an unsympathetic ear to complaints that its exacting standard for finding abrogation defeats what appears from legislative history to be the clear intent of Congress:

> We find it difficult to believe that ... Congress, taking careful stock of the state of Eleventh Amendment law, decided it would drop coy hints but stop short of making its intention manifest. Rather, the salient point in our view is that it cannot be said with perfect confidence that Congress in fact intended ... to abrogate sovereign immunity, and imperfect confidence will not suffice given the

special constitutional concerns in this area. *Dellmuth*, 109 S.Ct. at 2401–02. The Court has explained that its insistence on the strict standard for finding abrogation derives from its concern for the changes in the balance of federal-state power that result when Congress abrogates the states' Eleventh Amendment immunity. In *Atascadero*, 473 U.S. at 242–43, 105 S.Ct. at 3147, it stated:

> Congress' power to abrogate a State's immunity· means that in certain circumstances the usual constitutional balance between the States and the Federal Government does not obtain ... In view of this fact, it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment.

*See also Dellmuth*, 109 S.Ct. at 2400 (abrogation of sovereign immunity "upsets the fundamental constitutional balance between the Federal Government and the States" and places "considerable strain on the principles of federalism that inform Eleventh Amendment doctrine").

■ It is against this background that Judge Doyle's ruling on Eleventh Amendment immunity must be reexamined. In his October 1984 opinion Judge Doyle ruled that Congress had abrogated the states' Eleventh Amendment immunity when it enacted 28 U.S.C. § 1362, which gives the district courts original jurisdiction of all civil actions brought by any Indian tribe on matters of federal law. He noted that there was no explicit provision for abrogation in § 1362 and that the legislative history of the statute seemed to focus primarily on the need for elimination of a minimum jurisdictional amount. However, the Supreme Court had interpreted the same legislative history in *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), and had reached the conclusion that Congress had intended to make a tribe's access to federal court " 'in some respects as broad as that of the United States suing as the tribe's trustee.' " *Lac Courte Oreilles*, 595

F.Supp. at 1097 (quoting *Moe*, 425 U.S. at 473, 96 S.Ct. at 1641).

In *Moe*, the State of Montana contended that federal courts were without jurisdiction to hear suits by Indian tribes for injunctive relief from state taxes because 28 U.S.C. § 1341 prohibited them from enjoining enforcement of state tax laws where adequate state court remedies exist. The Supreme Court held that the federal courts could hear such cases and that the tribes were not barred from bringing them because they were of the kind that could be brought by the United States as plaintiff. Since the United States would not be barred by § 1341, and "the legislative history of § 1362 ... suggests that in certain respects tribes suing under this section were to be accorded treatment similar to the United States, had it sued on their behalf," the tribes would not be barred. *Moe*, 425 U.S. at 474, 96 S.Ct. at 1641–42.

*Moe* focused on the construction of a statute, not a provision of the United States Constitution. However, the statute at issue is one of considerable force. Section 1341 is a codification of a substantial common law privilege that can be raised as a bar to suit at any time by a party or by the court. *Illinois Central R.R. Co. v. Howlett*, 525 F.2d 178 (7th Cir.1975). Moreover, like the Eleventh Amendment, it operates to protect the states' treasuries. Although it does not protect the states from paying money damages, it protects their sources of income by precluding federal court suits to enjoin them from collecting particular taxes.

Relying on the effect given to § 1362 in *Moe* and on a number of lower court cases decided after *Moe* that had found that § 1362 abrogated the states' Eleventh Amendment immunity, Judge Doyle concluded that because the amendment would not have barred a suit by the United States as the tribes' trustee, it did not bar a suit brought directly by the tribe. *Lac Courte Oreilles*, 595 F.Supp. at 1080 (citing *Oneida Indian Nation of New York v. Oneida County*, 719 F.2d 525 (2d Cir.1983); *Oneida Indian Nation of New York v. New York*, 691 F.2d 1070 (2d Cir.1982); *Cayuga*

*Indian Nation of New York v. Cuomo,* 565 F.Supp. 1297 (N.D.N.Y.1983); *Charrier v. Bell,* 547 F.Supp. 580 (M.D.La.1982); *Confederated Tribes of Colville v. State of Washington,* 446 F.Supp. 1339 (E.D.Wash. 1978), *rev'd in part on other grounds,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)).

Not surprisingly, plaintiffs maintain that this ruling by Judge Doyle remains valid today. Alternatively, they argue that it is unnecessary even to reach the question of abrogation decided by Judge Doyle. First, they contend that the Eleventh Amendment does not apply to Indian tribes, because tribes are neither individuals nor foreign states and therefore are not covered by the language of the amendment. Second, they argue that under the plan of the constitutional convention, the states consented to suit by Indian tribes, and cannot now claim immunity from suit.

The Supreme Court has never ruled directly that the Eleventh Amendment precludes suits against states by Indian tribes, although in two cases it has suggested in dicta that it does. In *United States v. Minnesota,* 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926), the Court ruled that the United States had an interest in pursuing claims to title or proceeds of lands alleged to have been patented to the state by the United States in violation of its trust obligations to the Indians, despite the fact that the Indians were the real parties in interest. The Court based its holding on the guardianship relationship between the United States and Indian tribes and its belief that the state would be immune from a suit brought by Indians. *Id.* at 193–95, 46 S.Ct. at 300–01. The Court was less direct in *Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). In that case, it stated only that it was prepared to accept for the purpose of argument that "a State may interpose its immunity to bar a suit brought against it by an Indian tribe," *id.* at 614, 103 S.Ct. at 1388, but that it was not going to decide the issue because it was too late for the states involved to assert their immunity with respect to claims for water rights that had

initially been brought on behalf of the tribes by the United States.

Technically it is an open question whether the Court would read the Eleventh Amendment as applying to suits against the states by Indian tribes. However, the Court's present approach to Eleventh Amendment questions leaves little doubt what the answer will be. The Court does not consider it determinative that the entity seeking to sue is not one of those referred to specifically in the Eleventh Amendment. Rather, it looks to the nature of the protection granted the states. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (holding that Eleventh Amendment bars suits against states by its own citizens, although the amendment says nothing about such a bar) and *Monaco v. Mississippi,* 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) (holding that the amendment bars suits against states by foreign nations, which are not mentioned in the amendment).

Plaintiffs' second argument for not reaching the issue of § 1362's effect upon the states' immunity is that the Eleventh Amendment does not apply to them for the same reason that it does not apply to suits against the states by other states or by the United States. According to plaintiffs, the states' "acceptance of the constitutional plan" involved a "waiver or consent" which provides the basis for "coercive jurisdiction" in suits by one state against another state or in suits brought against a state by the United States, and in suits brought by Indian tribes. In making this argument, plaintiffs rely on the opinion of the United States Court of Appeals for the Ninth Circuit in *Native Village of Noatak v. Hoffman,* 896 F.2d 1157 (9th Cir.1990), *petition for cert. granted,* —— U.S. ——, 111 S.Ct. 37, 112 L.Ed.2d 14 (1990). The court of appeals concluded it was inherent in the grant to Congress of the power to regulate commerce with Indian tribes that the states had consented to federal jurisdiction over disputes between tribes and states. The court drew its reasoning from *Monaco v. Mississippi,* 292 U.S. 313, 54 S.Ct. 745, in which the Supreme Court articulated the "plan of the convention" theory, and con-

cluded that foreign states were barred by the Eleventh Amendment from suing states.

In *Monaco*, the Court ruled that the Eleventh Amendment barred a suit brought against a state by a foreign nation because

> [t]he foreign State lies outside the structure of the Union. The waiver or consent, on the part of a State, which inheres in the acceptance of the constitutional plan, runs to the other States who have likewise accepted that plan and to the United States as the sovereign which the Constitution creates. We perceive no ground upon which it can be said that any waiver or consent by a State of the Union has run in favor of a foreign State.

*Monaco*, 292 U.S. at 330, 54 S.Ct. at 751. The Court noted that states have "no prerogative of adjustment," such as the power to enter into a treaty or agreement with a foreign power, in controversies regarding international questions over which the United States has a "sovereign prerogative":

> It cannot be supposed that it was the intention that a controversy growing out of the action of a State, which involves a matter of national concern and which is said to affect injuriously the interests of a foreign state, or a dispute arising from conflicting claims of a State of the Union and a foreign State as to territorial boundaries, should be taken out of the sphere of international negotiations and adjustment through resort by the foreign State to a suit under the provisions of § 2 of Article III.

*Id.* at 331, 54 S.Ct. at 751.

The Court distinguished suits brought by one state against another state on the ground that federal jurisdiction over controversies between states was a "necessary feature of the formation of a more perfect Union":

> [t]he establishment of a permanent tribunal with adequate authority to determine controversies between the States, in place of an inadequate scheme of arbitra-

tion, was essential to the peace of the Union.

*Id.* at 328–29, 54 S.Ct. at 750. The Court went on to state that the jurisdiction of federal courts over suits brought against a state by the United States rests

> [u]pon a similar basis ... albeit without the consent of the [states]. While that jurisdiction is not conferred by the Constitution in express words, it is inherent in the Constitutional plan ... Without such a provision ... "the permanence of the Union might be endangered."

*Monaco*, 292 U.S. at 329, 54 S.Ct. at 750 (quoting *United States v. Texas*, 143 U.S. 621, 12 S.Ct. 488, 36 L.Ed. 285 (1892)).

In *Native Village of Noatak*, the Court of Appeals for the Ninth Circuit reviewed art. I, sec. 8, cl. 3 of the Constitution, which provides Congress with power "[t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes," and concluded that this clause constitutes consent by the states to federal jurisdiction over suits by Indian tribes for the following reasons. First, the tribes constituted a pervasive presence. The new Union could not exist without the allocation of governmental power in relation to the tribes. Second, the states needed the war and treaty-making powers of Congress to secure them from outbreaks of armed hostility by the Indians. Third, the power granted to the federal government over Indian affairs displaced the powers regularly exercised by the states within their borders. *Noatak*, 896 F.2d at 1162–63.

The court of appeals reasoned that "Indian tribes are more like the United States and the individual states of the United States than they are like individual citizens or like foreign states." *Id.* at 1163.

> Indian tribes, although not states, are like states in their presence within the United States as units of government, to be dealt with peacefully. Their presence as governmental units was as much a reality as the presence of the sister states at the time the Union was formed. Even more importantly, the Indian tribes are like the United States because it has

been for their benefit that the United States has frequently sued the states. It is in a modern evolution of this relation between them and the United States that they now act for themselves.

*Id.* In sum, the court concluded, the consent of the states to suit by Indian tribes was inherent in the plan of the Constitution, and there is no need for Congress to abrogate state sovereignty with express statutory language. *Id.* at 1164.

The approach taken by the Court of Appeals for the Ninth Circuit is novel and thoughtful, but not ultimately persuasive.

It is questionable whether the concept of the "plan of the constitutional convention is anything more than an artificial construct used by the Supreme Court to decide the politically difficult issue raised in *Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745 (whether foreign states should be permitted to sue the southern states for redemption of bonds issued during the Civil War). The theory depends upon the assumption that the states enjoyed immunity from suit at the time the Constitution was written and that they waived portions of this immunity when they entered the Union. Recent historical research suggests that the idea of state sovereign immunity was not a commonly held understanding in late eighteenth century colonial America. *See* Gibbons, *The Eleventh Amendment and State Sovereign Immunity: a Reinterpretation*, 83 Colum.L.Rev. at 1895–99, and sources referred to therein. Although the majority of the modern Court accepts the assumption that the states did enjoy sovereign immunity, their failure to refer to the plan of the Constitution or rely upon it for any purpose suggests that the concept has little vitality today.

Even if there is life to the concept, its application to the Indians is dubious. Implicit in the Court's analysis in *Monaco* is the idea that each state had as much to gain as it did to lose by entering into a union and submitting itself to suit by the other states and by the United States. It is this reciprocal benefit that forms the basis for inferring a waiver of the states' sovereign immunity from its "acceptance of the Constitutional plan." Although each state's sovereignty was diminished by surrender of its immunity to suit by other states, each state also gained the power to sue other states. At the same time, each state lost an aspect of its sovereignty by permitting the United States to sue it, but each state gained the security of knowing that the United States had the power to take action against an individual state that threatened the good of the nation.

There is no element of reciprocal benefit in the states' relationship with the Indian tribes. Because of the sovereignty of Indian tribes, states may not sue them in the absence of Congressional authorization. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1676–77, 56 L.Ed.2d 106 (1978). The states' relationship to the Indian tribes is mediated through the federal government. In *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), the Supreme Court ruled that the power of Congress to regulate commerce with the Indian tribes was exclusive and precluded states from enforcing their laws on Indian territory:

> The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties and with the acts of congress. The whole intercourse between the government of the United States and this nation, is, by our constitution and laws, vested in the government of the United States.

*Id.* at 560. Because the constitutional plan vested responsibility for regulating Indian affairs in the federal government, it is not likely that disputes between Indian tribes and states were intended to be resolved by private suit rather than by federal government action and intervention.

Whether Indian tribes are more like states or more like foreign nations is not determinative in analyzing the "plan of the convention." It is unlikely that the framers thought of the Indians in either catego-

ry. Justice Marshall described the relationship between the United States and the Indian tribes as "unlike that of any other two people in existence" and "marked by peculiar and cardinal distinctions which exist nowhere else." *Cherokee Nation v. Georgia*, 30 U.S. 1, 11, 5 Pet. 1, 16, 8 L.Ed. 25 (1831).

It is unlikely, either, that the states ever contemplated that Indians would have the desire or the capacity to sue them in a federal court. *See Cherokee Nation*, 30 U.S. at 12, 5 Pet. at 18 ("[a]t the time the constitution was framed, the idea of appealing to an American court of justice for an assertion of right or a redress of wrong, had perhaps never entered the mind of an Indian or of his tribe.") However, the informed consent of the states, or the lack of such consent, is irrelevant. *See Monaco*, 292 U.S. at 328, 54 S.Ct. at 750 (suits by one state against another involve "a principle which necessarily operates regardless of the consent of the defendant State").

What is determinative is whether it can be inferred from the relationship established between the states and the Indian tribes in the constitutional plan that the states implicitly or necessarily waived their sovereign immunity and consented to be sued by Indian tribes. In my view it cannot be. Indeed, the natural inference is to the contrary, in view of the absence of reciprocal benefit and the states' reliance upon the federal government to mediate their disputes with the Indians. Therefore, I conclude that although the Eleventh Amendment makes no specific reference to suits against the states by Indian tribes, it must be read as precluding such suits.

This conclusion makes it necessary to reconsider the issue decided by Judge Doyle: whether Congress abrogated the states' Eleventh Amendment immunity when it enacted 28 U.S.C. § 1362. Plaintiffs acknowledge the absence of any explicit abrogation provision in the language of § 1362. They argue, however, that reading § 1362 as not abrogating the states' immunity would trivialize the statute. Also, such a reading could defeat Congress's intent to recognize and encour-

age the autonomy of Indian tribes by giving them a right to sue on their behalf instead of by their trustee, the United States. More to the point, plaintiffs argue, the Supreme Court rejected such a restrictive reading of the statute in *Moe*, 425 U.S. 463, 96 S.Ct. 1634.

In holding that an Indian tribe was not barred by § 1341 from suing a state directly over a tax matter, a unanimous Court acknowledged that Indian tribes could sue states directly in federal court in a matter involving the public fisc. I agree with plaintiffs that *Moe* is important evidence that § 1362 did not merely eliminate the need for a minimum jurisdictional amount in suits by Indian tribes. It is significant that, although in *Moe* the Court did not hold that Indian tribes could sue a state for money damages, it did hold that a tribe could sue to prevent the collection of money by the state. Were it not for the Eleventh Amendment cases decided by the Court since *Moe*, I would read it in the same way Judge Doyle did, that is, as standing for the proposition that Indian tribes are to be treated like the United States when considering the jurisdictional power of the federal courts.

However, I cannot reconcile the result urged by plaintiffs with the forceful statements of the Supreme Court in the Eleventh Amendment cases decided since *Moe*. I have found only one case decided after the Supreme Court announced its new view of abrogation in which a court has held that § 1362 may be read as evincing Congress's intent to abrogate the sovereign immunity of the states to suits by Indian tribes. *See Red Lake Band of Chippewas v. Baudette, Minn.*, 730 F.Supp. 972 (D.Minn.1990). The court did not discuss the effect of the Supreme Court's approach to abrogation, and it relied upon the Ninth Circuit's first opinion in *Native Village of Noatak v. Hoffman*, published at 872 F.2d 1384, holding that § 1362 expressed an unmistakable intention to authorize Indian tribes to sue where the United States could sue on their behalf. This opinion was withdrawn and superseded by the opinion published at 896 F.2d 1157, in which the court of appeals stated that

It has been authoritatively held that to abrogate sovereign immunity of a state, Congress must express its intention to do so "in unmistakably clear language." *Welch v. Texas Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 478 [107 S.Ct. 2941, 2948, 97 L.Ed.2d 389] (1987). It has recently been reemphasized that congressional intent to abrogate sovereign immunity "must be both unequivocal and textual." *Dellmuth,* 109 S.Ct. at 2401. The statute conferring jurisdiction of suits brought by tribes does not unmistakably, unequivocally and textually abrogate the state's immunity, if immunity there is.

*Noatak,* 896 F.2d at 1162. For these reasons, *Red Lake Band* is of little help to plaintiffs' position.

Plaintiffs make the additional argument that the result in *Moe* reveals the Court's willingness to apply a less strict standard for finding congressional abrogation of sovereign immunity in suits brought by an Indian tribe against a state. This, they maintain, is because Indian tribes are sovereigns on whose behalf the federal government has always been able to sue, so that there is no change in the balance of power between the federal government and the states when Congress abrogates the states' sovereign immunity to permit Indian tribes to sue the states. Therefore, according to plaintiffs, the concerns that animated *Atascadero* and *Dellmuth* are not present in this case. On its surface, this is a compelling argument. However, I have found only one case in which it has been adopted: *Oneida Indian Nation of New York v. New York,* 520 F.Supp. 1278 (N.D.N.Y.1981). Furthermore, on appeal, the court of appeals declined expressly to hold that a lower standard of proof was required to show the intent to abrogate when Indians were involved, although it agreed with the district court that § 1362 abrogated New York's Eleventh Amendment immunity. *Oneida Indian Nation,* 691 F.2d at 1080 n. 8.

Plaintiffs' lower standard of proof argument depends on a narrow reading of the scope of the states' Eleventh Amendment immunity. Under this narrow interpretation of the Eleventh Amendment, it would make sense to draw a distinction between Congress's power to abrogate the states' Eleventh Amendment immunity with respect to suits brought by individuals and its power to abrogate with respect to suits brought by sovereign Indian tribes. However, a majority of the Court has consistently reaffirmed the broader view that the Eleventh Amendment embodies the principle that states are immune from being sued in federal court without their consent. *Dellmuth,* 109 S.Ct. at 2400; *Welch v. Texas Highways & Public Transp. Dept.,* 483 U.S. at 479–85, 107 S.Ct. at 2949–52; *Atascadero,* 473 U.S. at 238, 105 S.Ct. at 3145. Under this broad interpretation of Eleventh Amendment immunity, it is Congress's abrogation of the states' sovereign immunity that upsets the balance of federal and state power. It is immaterial who benefits by gaining the ability to sue the states in federal court. It is just as much an invasion of the states' sovereignty and a change in the balance of state and federal power for Congress to abrogate the states' immunity from suit by Indian tribes as it is for Congress to abrogate the states' immunity from suits brought by individuals.

Because § 1362 does not explicitly abrogate the states' Eleventh Amendment immunity from suit and because plaintiffs have shown no other basis for avoiding the bar of the Eleventh Amendment, I conclude that plaintiffs cannot pursue their claims for money damages against defendants.

The result of applying the Supreme Court's Eleventh Amendment analysis leaves the plaintiff tribes without an adequate remedy for the wrongs they have suffered. After more than sixteen years of litigation during which this court and the Court of Appeals for the Seventh Circuit have determined that the State of Wisconsin has violated plaintiffs' treaty rights for over 130 years, plaintiffs are left with no means of recovering monetary damages from the state except in the unlikely event that the United States joins this suit on their behalf. I find this result wholly at odds with the promises made to plaintiffs in the treaties of 1837 and 1842. Neverthe-

less, I am not free to rule otherwise, despite the consequences to plaintiffs, who have experienced all too often the hollowness of the promises made to them.

### ORDER

IT IS ORDERED that defendants' motion for partial summary judgment as to all of plaintiffs' monetary claims against defendants is GRANTED.